Glenn P. KIRKLAND, Lloyd Barrentine, R. C. Moore, W. D. Rogers, Charles W. Coble, Robert Jones and C. L. Allen, Plaintiffs,

v.

ARKANSAS–BEST FREIGHT SYSTEM, INC., International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Southern Conference of Teamsters and Central States Conference of Teamsters, both affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Roy L. Williams, Roy Lane and W. C. Smith, Union Representatives on the Multi-Conference (Central States/Southern) Change of Operations Committee, and Frank E. Fitzsimmons, Union Committee Chairman and General President, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendants.

Civ. No. LR–75–C–330.

United States District Court, E. D. Arkansas, W. D.

Findings of Fact and Conclusions of Law July 18, 1978.

Supplemental Findings of Fact June 21, 1979.

 

Ted Boswell, Bryant, Ark., for plaintiffs.

Thomas Harper, Fort Smith, Ark., R. F. Beagle, Jr., Kansas City, Mo., Richard B. McKelvey, Kansas City, Mo., for defendant Arkansas-Best Freight System.

L. D. Wells, Jr., Dallas, Tex., David Uel-men, Milwaukee, Wis., John T. Lavey, Little Rock, Ark., for defendant Unions.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM

HEANEY, Circuit Judge.

### FINDINGS OF FACT

1. The plaintiffs are employees of the Arkansas-Best Freight System, Inc., and members of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and an affiliated local union.

2. Arkansas-Best transports freight throughout the United States of America. It maintains terminal facilities in Little Rock, St. Louis, Kansas City, Dayton, Indianapolis, Cape Girardeau, Cincinnati, Atlanta, Asheville and numerous other cities. Prior to the commencement of this action, it maintained a terminal in Fort Smith. It is engaged in the hauling of motor freight in approximately twenty-five states. It is an "employer" as that term is defined in the National Labor Relations Act and is engaged in interstate commerce. Jurisdiction of the Court in this matter is founded on § 301 of the National Labor Relations Act, 29 U.S.C. § 185.

3. The defendants, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Southern Conference of Teamsters and Central States Conference of Teamsters are labor organizations as that term is defined in the National Labor Relations Act.

4. Roy C. Lane is an officer of Teamsters Local 200, a part-time organizer for the Central States Conference of Teamsters, and Chairman of the Central States Change of Operations Committee. W. C.

Smith is a General Organizer of the International Union, and Chairman of the Change of Operations Committee for the Southern Conference of Teamsters.

5. Prior to July 1, 1973, a National Master Freight Agreement covering over-the-road and local cartage employees was negotiated for the period July 1, 1973, through March 31, 1976. The parties to the agreement were employer associations authorized to negotiate on behalf of individual employers, individual employers who signed the agreement, the Teamsters National Freight. Industry Negotiating Committee of the International Brotherhood of Teamsters, and the local unions that signed the agreement. The Chairman of the Teamsters Committee is Frank E. Fitzsimmons, the General President of the International Union.

6. Prior to July 1, 1973, supplemental agreements covering the Central States and Southern Conference Areas were negotiated for the period July 1, 1973, through March 31, 1976. The Central States Agreement covered drivers employed in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, Iowa, Missouri, North Dakota, South Dakota, Nebraska, Kansas, Kentucky, West Virginia and Colorado. This agreement was between associations of employers or individual employers operating in that area, the Central States Drivers Council and individual local unions.

The Southern Conference Agreement covered drivers employed in Alabama, Florida, Georgia, Mississippi, Tennessee, Arkansas, Louisiana, Oklahoma and Texas. This agreement was between associations of employers or individual employers operating in that area, the Southern Conference of Teamsters and individual local unions.

7. The National Master Freight Agreement contains the following provisions:

Seniority rights for employees shall prevail under this Agreement and all Agreements supplemental hereto. Seniority shall only be broken by discharge, voluntary quit, more than a three (3) year layoff, or for such greater period than three (3) years as a change of operations committee may direct during the third

year as provided in Article 8, Section 6 herein, or as provided in any applicable provisions of the Supplemental Agreements. The extent to which seniority shall be applied and accrued as well as the methods and procedures of such application shall be clearly set forth in each of the Supplemental Agreements.

Article 5, Section 1.

(b) Closing of branches, terminals, divisions or operations.

\*    \*    \*    \*    \*    \*

(2) When a branch, terminal, division or operation is closed or partially closed and the work of the branch, terminal, division or operation is transferred to another branch, terminal, division or operation in whole or in part, employees at the closed or partially closed down branch, terminal, division or operation shall have the right to transfer to the branch, terminal, division or operation into which the work was transferred prior to the recall of laid off employees at that location. Such employees transferring as a result of an approved change of operations, shall be dovetailed with their full classification seniority (city or road) into the active seniority roster at the point of redomicile, excluding those employees on letter of layoff. If and when additional employees are required at the point of redomicile, employees on layoff status at that location shall be recalled. When recalled, such laid off employees shall be dovetailed with their full seniority.

Article 5, Section 5(b)(2).

Present terminals, breaking points or domiciles shall not be transferred or changed without the approval of an appropriate change of operations committee. Such committee shall be appointed in each of the Conference Areas, equally composed of employer and union representatives. The change of operations committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding.

The change of operations committee shall also have jurisdiction for a period of twelve (12) months following the opening of a new terminal to consider the redomicile of employees who are laid off as a direct result of such opening of terminal.

This committee shall also have jurisdiction over the closing of terminals in regard to seniority. This shall not apply within a 25-mile radius. In considering any change of operations, this committee shall have the power to extend the three (3) year layoff period contained in Article 5, Section 1, or in applicable Supplemental Agreements, in the event it appears toward the end of such period that the circumstances warrant.

The Committee shall observe the employer's right to designate home domiciles and the operational requirements of the business. However, individual employees shall not be redomiciled more than once during the term of the contract as a result of an approved change of operations unless a merger, purchase, sale, acquisition, or consolidation of employers is involved, or unless the change of operations committee rules to the contrary based on the facts presented.

The National Grievance Committee shall adopt Rules of Procedure concerning the application and administration of this Article.

The Employer shall notify all affected Local Unions of the proposed Change of Operations at least twenty (20) calendar days prior to the hearing at the Joint Area Conference Committee and the Employer and the Local Unions affected shall have a mutual responsibility to inform the affected employees prior to such hearing in accordance with the practice and procedures agreed to in the respective area committees. Any exception or waiver of the aforesaid twenty (20) day period shall be mutually agreed to between the Employer and the Local Unions affected and approved by the Conference Area Change of Operations Committee.

Where an employee is required, through no fault of his own, to change domicile in order to follow employment as a result of an approved Change of Operations the Employer shall move the employee and assume the responsibility for proven loss of or damage to household goods due to such move including insurance against loss or damage. Should any employee possess household items of unusual or extraordinary value which will be included in the move such items shall be declared and an appraised value determined prior to the move. The Employer shall provide packing materials for the employee's household goods when requested or at the employee's request pay all costs and expenses of moving such household goods, including packing. This shall not apply to moves within 50 miles radius.

The Employer shall pay reasonable expenses to demount and remount an employee's mobile home, if used as his residence and in such instance shall pay normal expenses to move such mobile home, including the use of other modes of transportation where required by law.

The Employer shall provide lodging for the employee at the point of redomicile, not to exceed thirty (30) calendar days, and in addition, shall reimburse the employee 10 [cents] per mile to transport one personal automobile to the new location.

The Employer shall not be responsible for moving expenses if the employee changes his residence as a result of voluntary transfer.

Article 8, Section 6.

8. The supplemental agreements covering the Southern Conference and Central States Areas also have provisions relating to seniority.

Central States Conference of Teamsters generally uses a "terminal" seniority system. "Terminal seniority" is a term which describes a seniority application in which the driver maintains a position on the seniority list only at the terminal in which he is employed. If he is laid off at the terminal for lack of work, he may not exercise

any seniority into any other terminal of the employer.

The Southern Conference of Teamsters additionally uses "system" seniority. "System" seniority is a term which is applied to a seniority application in which the driver enjoys a seniority position based on his length of service with the employer. When vacancies occur in other terminals or when jobs are open for bid in any one of the employer's terminals, any employee working within that entire system may exercise his seniority to bid the available job.

"Modified system" seniority is a term which describes a seniority application similar to "system" seniority but which permits the driver to exercise this system seniority only when he cannot hold employment in the terminal at which he is working. If he faces layoff in his terminal, he may bid to any other terminal of the employer covered by this seniority agreement where a junior man is working. This modified system seniority is lost when the driver moves out of the Southern Area.

The "system" and "modified system" are put into effect in the Southern Conference only after a vote of the employees affected.

9. In May, 1975, Arkansas-Best proposed a change of operations. The proposed change was scheduled to be heard at the June, 1975, hearings in Chicago. This proposal involved changes in the domicile of drivers in ten terminals located in the Southern and Central States Conference Areas. Each terminal was described in the proposal, with existing runs and proposed new runs outlined in detail. Seniority lists were presented and detailed procedures outlined for the drivers to select terminal preferences by seniority.

Under this proposal, the impact on drivers at the various involved terminals would have been as follows:

| Losing Terminals | Impact |
| --- | --- |
| St. Louis | Minus 9 |
| Cape Girardeau | Minus 18 |
| Little Rock | Minus 18 |
| Atlanta | Minus 9 |
| Fort Smith | Minus 14 |

| Gaining Terminals | Impact |
| --- | --- |
| Kansas City | Plus 1 |
| Dayton | Plus 40 |
| Asheville | Plus 3 |
| Cincinnati | Plus 9 |
| Indianapolis | Plus 8 |

10. The meeting on the proposed change of operations was held in June, 1975. The following persons served on the Committee hearing the change of operations:

| Employer Representatives | Union Representatives |
| --- | --- |
| Hal Franke Central Conference | Roy Lane Central Conference |
| M. B. Harp Southern Conference | W. C. Smith Southern Conference |

Others may also have served on the Committee, but no witness was able to say who they may have been. Roy Lane served as chairman.

11. Arkansas-Best presented its proposed change of operations plan to the committee. The Little Rock, Fort Smith, Cape Girardeau and St. Louis local unions objected vigorously to the proposed change because they would lose significant numbers of employees. The plan was also objected to by Lane. He was the dominating member of the Change of Operations Committee. Roy Lane, W. C. Smith and others suggested changes in the plan. Arkansas-Best was further asked to withdraw the request and submit a new request to the Change of Operations Committee in the Southern Conference.

12. M. B. Harp owned 1,213 shares of ABC stock, a holding company which had among its subsidiaries Arkansas-Best Freight System, Inc.

13. On September 26, 1973, the National Grievance Committee, established by the National Master Freight Agreement, adopted Rules of Procedure. Article III of these rules cover changes of operation. The rules provide:

### ARTICLE III—CHANGE OF OPERATIONS

(A) Proposals for changes of operation filed under Article 8(e) of the National

Master Freight Agreement involving members of Local Unions which are located in more than one Conference Area, shall be filed with both the Union and Employer Secretaries of the National Grievance Committee. The filing shall include a list of the Local Unions involved, together with their addresses. In addition, the Employer shall mail the proposed change of operation directly to the Local Unions listed.

(B) The Employer and Union Secretaries of the National Grievance Committee shall jointly assign the proposed change of operation to one of the Conference Joint Area Change of Operations Committees. Time of filing requirements of the Area Rules of Procedure shall not apply, but in any event, reasonable notice shall be given to all parties. However, if meeting conflicts occur, the Secretaries may, at their discretion, reassign or reschedule the Change.

(C) The rules of procedure of the Conference Joint Area Change of Operations Committees shall be followed by all parties, but equal Employer and Union representation from the other affected Conference Areas, shall be allowed on such Change of Operations Committees. The Employer and the Union Change of Operations Committee Chairmen shall have the right to designate the respective committee members consistent with the above.

(D) A record shall be made of the proceedings before the Conference Change of Operations Committee and, in the event of deadlock, such transcript and records shall be forwarded directly to the Employer and Union Secretaries of the National Grievance Committee, the latter then having jurisdiction of the matter. The transcript and records so forwarded shall be the sole basis for committee decisions unless other methods of obtaining evidence are agreed to by the National Grievance Committee.

(E) Changes of operation which involve members of Local Unions which are located solely in one Conference, shall be processed pursuant to the rules of procedure of the applicable Change of Operations Committee. In the event of deadlock thereof the matter is to be processed pursuant to the National Grievance Procedure of Article 8 of the National Master Freight Agreement.

W. C. Smith and Roy Lane testified that Rule III(C) was modified by custom and practice to permit unequal representation on inter-conference Change of Operations Committees. I do not credit this testimony. No such custom and practice was shown.

14. Rule III(C) of the Rules of Procedure was followed at the June, 1975, hearing as there was equal representation from each Conference on the Committee.

15. On July 17, 1975, a second proposed change of operations was submitted to a Change of Operations Committee consisting of:

| Employer Representatives | Union Representatives |
| --- | --- |
| R. Pulliam<br>Southern Conference | W. C. Smith<br>Southern Conference |
| R. Braziel<br>Central States Conference | K. Rittman<br>Central States Conference |
| K. Skaggs<br>Eastern Conference | W. Neidig<br>Eastern Conference |

This Committee was constituted in accordance with the Rules of Procedure of the Change of Operations Committee. A new concept was advanced at this hearing that would have permitted the individuals at the affected terminals to make a "paper bid." This was done in the hope of reducing the actual number of moves since the "domino" effect of moving could be avoided. The Little Rock, Cape Girardeau, Kansas City, St. Louis and Fort Smith locals objected to the change. The Asheville and Cincinnati locals had no objections. No decisions were made. Arkansas-Best was given the right to withdraw the change. It subsequently exercised this right.

16. Arkansas-Best proposed a third change which was heard in September, 1975. This proposal followed the first proposal in some respects, but had a significantly greater adverse impact on locals affiliated with the Southern Conference. Under that proposal, the locals were affected as follows:

| Losing Terminals | Impact |
|---|---|
| St. Louis | Minus 5 |
| Cape Girardeau | Minus 6 |
| Little Rock | Minus 25 |
| Fort Smith | Minus 14 |

| Gaining Terminals | |
|---|---|
| Kansas City | Plus 2 |
| Dayton | Plus 38 |
| Cincinnati | Plus 5 |
| Indianapolis | Plus 5 |

The proposal did not permit the drivers from Little Rock or Fort Smith to follow their work to St. Louis and Cape Girardeau.

The members of the Change of Operations Committee were as follows:

| Employer Representatives | Union Representatives |
|---|---|
| Hal Franke | Roy Lane |
| Central States Conference | Central States Conference |
| M. B. Harp | W. C. Smith |
| Southern Conference | Southern Conference |
| Wayne Henderson | R. Fularczyk |
| Central States Conference | Central States Conference |

The Change of Operations was not constituted in accordance with the Rules of Procedure insofar as the Central States Conference had two representatives on the Committee and the Southern Conference had one. M. B. Harp, who continued to hold ABC stock, was again a member of the Committee.

17. The Cape Girardeau, St. Louis, Dayton, Little Rock and Fort Smith locals objected to the change. The Indianapolis, Kansas City and Cincinnati locals did not object to the change.

18. Don Little, a labor relations assistant for Arkansas-Best, contacted both Roy Lane and W. C. Smith prior to the September hearing to discuss the proposed change of operations. Smith indicated that he would vote for approval of the change. I specifically credit the testimony of Little in this regard.

Little also contacted Hal Franke prior to the September hearing. Franke assisted Little in the preparation of the change of operations presentation.

19. An accurate record was not made at the third hearing. The transcript of the third hearing shows that Smith talked to Alfred Pickering, the president of the Little Rock local, whereas such a conversation never occurred. The transcript also fails to record an exchange of words between Lane and Pickering. I specifically credit the testimony of Glenn Kirkland in this regard.

20. W. C. Smith played a passive role in the third hearing. He did not speak once during the local union's presentation. Instead, he read a newspaper and smoked a cigar during the entire hearing. I credit the testimony of Glenn Kirkland in this regard.

21. Roy Lane was the dominant force on the first and third Change of Operations Committees. This dominance was manifested in various ways. First, he repeatedly made decisions for the Committee without seeking the concurrence of other Committee members. Second, he frequently interpreted the collective bargaining agreement without asking the views of other members of the Committee.

22. Lane was more protective of the rights of the members of the Central States Conference than he was of the Southern Conference.

23. In 1975, the longtime leadership of Local 878 of the I.B.T., Little Rock, was defeated by a slate led by employees of Arkansas-Best, including many of the plaintiffs in this action. Supporters of the defeated officers encouraged the president of the International Union to appoint a trustee for the local union. The local union attempted to secure a restraining order seeking delay of a trusteeship hearing. This request was granted in part, and the International Union sent an investigating committee into the local. A decision was subsequently made by the president of the International Union not to put the local into trusteeship. A factor in that decision was the willingness of the plaintiffs in this action to resist the International Union's actions in court. Relations between the officers and agents of the International Union and the Southern Conference and the plain-

tiffs continued to be strained during the period of time that the change of operations proposals were being heard. This strained relationship was a factor in the decision of Lane, Smith and Fularczyk to accept the plan proposed by Arkansas-Best at the third change of operations hearing.

24. There is no evidence in the record to support the plaintiffs' allegation that the International Union encouraged Arkansas-Best to make the request for a change of operations, nor is there any evidence in the record to support plaintiffs' allegation that the members of the Change of Operations Committee were bribed by Arkansas-Best to support the change of operations.

25. When the change of operations was put into effect, the Little Rock terminal had in excess of 150 drivers. Eighteen of them were on layoff status.

26. Twenty-five drivers were needed to fill the vacancies in the Central States Conference terminals, most of the vacancies were in Dayton. Twenty-five drivers were given the opportunity by seniority to bid into the master active pool and then into a Central States terminal.

27. Under the modified seniority provisions in effect in the Southern Conference, Fort Smith drivers were given the alternative of taking a letter of layoff and waiting for the work to resume at Fort Smith, bidding into the master active pool and obtaining work in the Central States Conference of Teamsters, or exercising their modified seniority system and bumping into any terminal in the south where a junior man was working. Twelve Fort Smith drivers chose to bump into Little Rock. This had the effect of requiring an equal number of Little Rock drivers to move to the Central States Conference or to take layoff status. Twenty-one Little Rock drivers elected to move to the Central States Conference; four were placed on layoff.

28. The plaintiffs contend that the change of operations approved by the Committee was violative of Article 5, Section 5(b)(2) of the National Master Freight Agreement and the Modified Southern Conference Seniority provisions as interpreted and applied. This contention is not without merit, but the Court finds that the interpretations given to these clauses of the agreements by the Change of Operations Committee were not impermissible ones given the broad authority of the Change of Operations Committee.

29. The Change of Operations Committee has the duty to resolve questions of seniority and domicile fairly and in good faith, and in accordance with established rules of procedure and fundamental due process. Moreover, the union members of the Committee have a duty to fairly represent all employees involved in the change.

30. Established rules of procedure were not followed with respect to the change of operations.

a. The Change of Operations Committee, which granted the change, was not constituted in accordance with the written Rules of Procedure.

b. An employer member of the Committee had a significant interest in Arkansas-Best and, thus, was not qualified to sit as a member of the Committee.

c. A complete record of the hearing was not kept.

31. Fundamental rules of fairness were violated.

a. Employees of Arkansas-Best had ex parte prehearing contacts with members of the Change of Operations Committee.

b. W. C. Smith, a union member of the Change of Operations Committee, consented to the change before hearing the views of the Fort Smith and Little Rock local unions. While it could be said that he was somewhat informed of their views because of his participation in the prior hearings and because of his status as an international organizer for the Southern Conference, his conduct in giving his assent before the hearing as to the proposed change and in assuming a passive role at the change of operations hearing, was improper.

c. Roy Lane, the chairman of the Change of Operations Committee, conducted himself improperly by deciding issues

without giving other members of the Committee a chance to participate in the decision-making process.

32. The union representatives on the Change of Operations Committee, particularly Lane and Smith, failed to fairly represent the plaintiffs at the change of operations hearing. They acted in bad faith.

a. Lane and Smith permitted the fact that plaintiffs had exercised their right to change the leadership of their own local union and to resist the imposition of a trusteeship by the International Union to affect their decisions in the matter.

b. Smith, the representative of the Southern Conference of Teamsters, failed to adequately represent the employees of that Conference at the third change of operations hearing for the reasons stated in Finding No. 31b.

33. Each of the violations set forth in Findings Nos. 30, 31 and 32 is sufficient grounds for holding that the decision of the Change of Operations Committee was arrived at in violation of the collective bargaining agreement and in violation of law. The International Union and the defendant Conferences are each responsible for the actions of its members of the Change of Operations Committee.

34. *Damages.*

The plaintiffs are entitled to damages. The plaintiffs have neither alleged nor proved future damages. I award none. I have determined the principles that shall be followed in computing damages and have compute the damages for the twelve representative plaintiffs on whose behalf testimony was offered. I direct the parties hereto to meet for the purpose of fixing damages for the remaining plaintiffs and to agree on their damage awards within fifteen days of the date that this order is entered. If the parties are unable to agree as to the damages to be awarded to any or all of the remaining plaintiffs, the Court will appoint a master to hear additional testimony with respect to such damages and to make recommendations. The Court will assess the costs of such a master after the master has made his recommendations to the Court. Damages shall be computed with respect thereto as follows:

a. Persons who transferred from Little Rock or Fort Smith to another terminal in the Central States or Southern Conference of Teamsters shall be entitled to receive the expenses reasonably incurred in making the transfer, less any expenses heretofore reimbursed by the employer. In computing these expenses, no deductions will be made for any increase in earnings by an employee who transferred.

b. Employees who were members of the Fort Smith local were not required to move from Fort Smith to mitigate their damages. Employees who were members of the Little Rock local were not required to move from Little Rock to mitigate their damages. They were required to seek comparable work in the communities in which they live. Employees who remained at Little Rock or Fort Smith and who were laid off or had reduced work as a result of the change of operations decision are entitled to receive compensation on the basis of the following formula: The miles driven by an employee in the twelve months preceding the change will be computed. The miles driven by an employee in each of the next two twelve-month periods will be computed. The miles driven by the employees in each of the two twelve-month periods subsequent to the change will be deducted from the miles driven in the twelve-month period preceding the change, and an allowance of eighteen cents per mile will be made. Pursuant to an agreement between the parties, credit for unemployment compensation benefits in the amount of $100.00 per week will be given. No credit will be given for earnings from a farm or business if the business was one which was formed prior to the change of operations or one that was formed thereafter and has continued from the change of operations to this date, unless it is clearly demonstrated that the earnings from the farm or business substantially increased during the period of layoff or reduced earnings.

c. Employees will be compensated for lost vacation or holiday pay but will not be compensated for loss of sick pay.

d. Employees who had fixed runs involving fixed hours prior to the change, but were relegated to other runs after the change, and were required to be on duty on a 24-hour a day, seven days a week, basis are entitled to be reimbursed for having to stand by the extra hours. The Court fixes these damages at $2,500 per year.

e. The plaintiffs listed below are awarded the sum listed beside their names. The Court finds that their damages flowed directly from the improper and unlawful decision of the Change of Operations Committee, and that the defendants are jointly and severly liable for their payment:

| | |
|---|---|
| James E. Barnhouse | $ 7,000 |
| W. D. Rogers | $ 5,000 |
| Carl T. Cooper | $ 5,000 |
| Glenn P. Kirkland | $ 8,000 |
| Lloyd B. Barrentine | $ 2,400 |
| Clarence Allen | –0– |
| Wayne Coble | $ 3,000 |
| Reuben C. Moore | $ 1,500 |
| Arvin E. Skidmore | $ 4,200 |
| Keith M. Alsip | $ 1,400 |
| Norman McDonald | $ 3,000 |
| Jimmy N. Scates | $ 1,500 |

35. *Equitable Relief.*

The plaintiffs request that the change of operations decision be set aside and the status quo be restored.

The defendants would permit the status quo to remain and would establish a new Change of Operations Committee. They would permit the Committee to decide if the initial change should be ratified, amended or set aside.

Neither approach is equitable. The first is inequitable because it ignores the fact that many employees who are not parties to this action would be substantially affected, the cost to the employer—who is only partially responsible—would be prohibitive, and interstate commerce would be adversely affected. This approach is inequitable for another reason. Months have passed since the change was approved. The defendants have not been responsible for all of the delay; some was caused by the congestion of the calendar. The second is inequitable because it would leave to the parties, who have violated their trust and the collective bargaining agreement, the power to determine the extent of the equitable relief.

In light of the above, it is the order of the Court that plaintiffs who had accepted a transfer to a terminal other than Little Rock shall be given an opportunity to transfer to Little Rock whenever a vacancy occurs on the Little Rock board. The parties shall agree to reasonable procedures for notifying the plaintiffs of these vacancies and their manner of acceptance, and shall submit these procedures to this Court within thirty days of the date that final judgment is entered herein.

Plaintiffs shall be given the opportunity to return to Little Rock in order of their seniority, but no plaintiff shall have more than one opportunity. On returning to Little Rock, the plaintiffs shall be given a position on the Little Rock seniority board commensurate with their total seniority with Arkansas-Best. Expenses incurred in such retransfer shall be borne by the defendants in accordance with the principles heretofore established. Upon retransfer to Little Rock, employees will have their Southern Conference modified seniority restored to them.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1336 and 29 U.S.C. § 185.

2. The decision of the Change of Operations Committee is set aside because:

It was reached in violation of the Rules of Procedure established by the collective bargaining agreement;

Fundamental rules of fairness were violated in the decision-making process; and

The union representatives on the Committee acted in bad faith and failed to fairly represent the plaintiffs at the change of operations hearing.

3. The plaintiffs who submitted testimony with respect to damages are awarded damages in the sums set forth in Finding No. 34e. The remaining plaintiffs will be given an opportunity to prove damages in accordance with Finding No. 34.

4. The individual defendants are dismissed pursuant to stipulation by the parties. The remaining defendants are jointly and severly liable for the payment of all damages.

5. The plaintiffs are entitled to equitable relief in accordance with Finding No. 35.

6. When damages have been ascertained with respect to the remaining plaintiffs, the Court will cause a judgment consistent with these Findings of Fact and Conclusions of Law to be entered. Until such time it is not intended by this Court that this order shall be a final and appealable one.

## MEMORANDUM

The Findings of Fact and Conclusions of Law set forth the Court's reasons for deciding this case. The Court deems it important, however, to acknowledge arguments made by the defendants in briefs and in oral argument. The Court recognizes the necessity for a Change of Operations Committee, and is aware that it does not have the power to set aside a Committee's decision unless the Committee failed to follow the rules established for it in some material way or failed to accord the parties fundamental due process, or the union representatives failed to fairly represent the employees involved or acted in bad faith. Each of the stated reasons for setting aside a decision is present here.

■ The Court notes and rejects the defendants' argument that a decision cannot be set aside if it is a permissible one under the contract. The argument proves too much. If followed to its logical conclusion, it would permit a Change of Operations Committee to openly and flagrantly violate its own rules and regulations, and to discriminate against individual employees as long as it could be said that the result reached was a permissible one. This Court is unwilling to assume that a properly composed Change of Operations Committee, acting in accordance with the Rules of Procedure and fundamental due process, would necessarily have arrived at the same decision as this Change of Operations Committee did. Admittedly, the Change of Operations Committee has broad authority. Admittedly, the decision arrived at was a permissible one, but there were other permissible results which could have been reached under the seniority provisions of the various collective bargaining agreements. Some of them would have been more beneficial to the plaintiffs than the one reached. This does not mean that the plaintiffs were entitled to a decision which would be to their benefit and to the detriment of other employees. It only means that all affected employees were entitled to have a decision made in accordance with the established written Rules of Procedure and to have that decision reached in complete honesty and good faith and in accordance with fundamental due process. Indeed, unless the employees of the industry perceive that change of operations decisions are made on this basis, the wide authority now given to committees may be severely limited and the whole industry may be the loser.

■ The defendants raise another argument. They argue that because the plaintiffs failed to object to the composition of the Change of Operations Committee, they are now foreclosed from making such an objection before this Court. The Court is unwilling to accept that argument for several reasons. First, it should be noted that the first and second Change of Operations Committees were properly composed. Second, it is clear from the record that the employees had no way of knowing who would constitute the Committee until they arrived at the meeting. Third, in light of the record as a whole, the Court finds that it would have been useless for the employees to make any objections to the composition of the Committee at the time of the hearing.

The unions argue that it was proper for their leaders to be partisan. The Court accepts this argument, with one important exception. Partisanship must be exercised fairly on behalf of all affected employees, not only a segment of them. The Court even accepts the fact that representatives of both the Central States Conference and the Southern Conference will protect the interests of their respective members to the best of their ability. The Court cannot, however, accept a stacking of the committees so that the representatives of one Conference are in a position to out-vote the representatives of another. In this regard, the Court is aware of the testimony of one or more union witnesses that representatives of the Change of Operations Committee are not solicitous for their Conference members when they sit on the committees. The Court's answer to this contention is that it is belied by the record. This is not to say that men of intelligence, integrity and judgment will not be fair to members of every Conference. The Court merely acknowledges that the Rules of Procedure recognize the difficult position in which union representatives are placed in such matters and attempt to guard against difficulties by providing for equal representation from each Conference when changes in operations involve more than a single Conference.

The defendants argue that ex parte conversations between employer representatives and union officials are proper. This Court cannot agree that it is proper for an employer seeking a change of operations to contact one of the members of a Change of Operations Committee on an ex parte basis. It is, of course, proper for an employer to contact the local unions involved and to explain the change of operations to them prior to the hearing so that they will have an opportunity to review it, understand it and to take a position on it. However, it is not proper to seek out and attempt to persuade the members of the panel.

The employer finally asserts that no damages can be awarded because they are too speculative. The Court recognizes the difficulties involved in assessing damages, but feels that the principles used by it are fair and reasonable, particularly in light of the limited equitable relief that is possible. It is not easy to measure the damages incurred by an employee who is required to sell his home and move or to be on call twenty-four hours a day, seven days a week; but the damages are reasonably measured by the techniques used by the Court and no more is necessary. Nor is it an answer to say that, because the change was a permissible one, no damages can be given even though the one approved was approved in an unlawful manner. If one were to follow this line of reasoning, employees would have no way of requiring their union to represent them fairly or of requiring change of operations committees to follow agreed-upon procedures.

This memorandum is incorporated in the Findings of Fact and Conclusions of Law.

## SUPPLEMENTAL FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM

### SUPPLEMENTAL FINDINGS OF FACT

1. On July 20, 1978, the Court filed its Findings of Fact and Conclusions of Law in the above entitled matter. These findings and conclusions are hereby affirmed.

2. Pursuant to Finding No. 34, the parties have agreed on damages for a number of plaintiffs, but were unable to agree as to others. On November 27, 1978, an Order of Reference was filed appointing Robert F. Fussell as a master to hear additional testimony with respect to such persons and to make his recommendations.

3. The master found that the following plaintiffs were entitled to damages in the amounts set forth beside their names:

| | |
|---|---|
| Bechtel | $1,105.77 |
| Blanton | 5,175.18 |
| Brewington | 8,708.56 |
| Burgess | 3,454.90 |
| Caldwell | 2,932.70 |
| Carr | 3,130.00 |
| Cockrum | 869.94 |
| Derrington | 4,584.90 |
| Dye | 3,192.66 |
| Ellis | 3,808.44 |

| | |
|---|---|
| Gray | $1,766.88 |
| Griffin | 5,497.40 |
| Healea | 1,786.85 |
| Howard | 1,703.70 |
| Jefferson | 7,404.66 |
| Kauffman | 7,761.14 |
| Lemay | 12,719.56 |
| Lindquist | 1,632.00 |
| McDonald | 3,065.58 |
| Marshall | 5,627.70 |
| Mason | 2,700.54 |
| Mauldin | 9,547.93 |
| Middleton | 2,932.70 |
| Milam | 2,019.23 |
| Moyer | 2,840.30 |
| Patterson | 3,999.56 |
| Richards | 2,720.48 |
| Runyan | 3,400.24 |
| Shaw | 89.00 |
| Cleveland Smith | 3,295.98 |
| Stanton | 1,841.14 |
| Stapleton | 205.02 |
| Thomason | 4,142.50 |
| H. Thompson | 841.50 |
| Wells | 612.36 |

The Court has carefully reviewed the record and adopts the master's report. *See* Fed.R. Civ.P. 53(e)(2).

4. The plaintiffs' objections to the master's damage findings with respect to plaintiffs Derrington, Middleton and Caldwell are rejected.

5. On December 22, 1978, the claims of Charles R. Robinson and James W. Kinsey came before the Court for a hearing to determine the amount of their loss resulting from the change of operations. After having heard the evidence and the arguments of counsel, the Court finds that Robinson is entitled to damages in the amount of $1,764.15, and that Kinsey is entitled to damages in the amount of $4,284.66.

6. Subject to the objections that have already been registered to the Court's Findings of Fact and Conclusions of Law, the parties have agreed that the following individuals are entitled, pursuant to the Court's findings, to damages in the following amounts:

| | |
|---|---|
| Arman | $ 931.86 |
| Carter | 1,000.98 |
| Daniel | 4,063.50 |
| Davidson | 4,098.78 |
| Halstead | 1,878.12 |

| | |
|---|---|
| Hammock | $2,225.70 |
| Keeney | 5,094.18 |
| Matthews | 409.68 |
| Reaves | 6,274.80 |
| Wetherington | 1,028.61 |
| Williams | 3,100.68 |
| Wilson | 7,135.74 |
| Garner | 469.00 |
| Deaton | 2,459.52 |
| Brewer | 378.76 |
| Edwards | 5,942.88 |
| Ghent | 4,688.44 |
| Wheeler | 6,002.10 |
| Burkett | 5,000.00 |
| Hamby | 5,000.00 |
| Hawkins | 8,131.32 |
| Lovell | 8,388.32 |

7. No other plaintiffs are entitled to money damages.

8. In August, 1978, the Court was contacted by several drivers who had been transferred to Dayton, Ohio. They had originally been plaintiffs in this action, but subsequently opted out. They alleged that they had been misled by certain correspondence from plaintiffs' counsel and that they would have remained as plaintiffs but for this misunderstanding. The Court notified counsel of this correspondence and required any individual with the same allegations to contact plaintiffs' counsel by August 28, 1978. A hearing was held on August 28, 1978, to determine the matter. The Court found, that except for one individual whose name had inadvertently been left off the list of plaintiffs, that all of these individuals had refrained from further participation in the action with knowledge of its essential nature.

9. On September 7, 1978, Glen Farrier moved to permit the submission of various documents concerning his claim which the Court granted. The plaintiffs now move that Farrier be made a plaintiff. Farrier appears to be in the same situation as those individuals who were denied re-entry into the action at the August hearing. Although he was aware of the Court's ruling that his claim should be submitted prior to August 28, 1978, he states no reason for failing to do so.

10. The Court also finds that a reasonable fee for the master's time and expenses

is $4,462.82 in accordance with his Statement for Services Rendered. The costs of the court reporter are $612.00. The master's fee and the associated costs of the master's proceedings will be taxed 50% to the plaintiffs and 50% to the defendants.

## SUPPLEMENTAL CONCLUSIONS OF LAW

1. The master's report is adopted.

2. The plaintiffs set forth in Supplemental Findings Nos. 3, 5 and 6 are awarded damages in the sums set forth beside their names.

3. No other plaintiffs are entitled to money damages, but are entitled to the equitable relief specified in Finding No. 35.

4. The plaintiffs' motion to allow Glen Farrier to be made a plaintiff is denied.

5. The Court denies Arkansas-Best Freight System, Inc.'s motion to set aside the liability findings or to apportion damages among the defendants according to their relative fault.

## SUPPLEMENTAL MEMORANDUM

The plaintiffs object to the master's damage findings with respect to plaintiffs Derrington, Middleton and Caldwell. They argue that these individuals are entitled to pro rata damages for loss of a bid run after May 13, 1977 in addition to an allowance of pro rata damages from the date of the change of operations until February 22, 1977.

On February 22, 1977, plaintiff Patterson bid and was awarded a bid run from Little Rock, Arkansas, to Wheatley, Arkansas. Under Company policy, once a driver is awarded a bid run, he is obligated to hold that bid run for a year. An exception to the Company policy occurs when a bid run has been cancelled one time a week for four consecutive weeks. A driver may then elect to cancel the bid run and return to the extra board. The bid run may then be re-bid. On April 26, 1977, Patterson cancelled the bid run in accordance with Company procedure for personal reasons. It is conceded that Patterson would have held the bid run throughout the remainder of the damage period if he had wanted it. Caldwell, Derrington and Middleton were running extra board after the change of operations and all had more seniority than Patterson. They voluntarily chose not to bid for the Wheatley run on February 22, 1977. It is conceded that they would have been awarded the run because of their greater seniority if they had bid. In light of their voluntary refusal to bid and the fact that they would have retained the run throughout the remainder of the damage period, the master determined that they should not receive damages after February 22, 1977, although when the run was re-bid on May 13, 1977, it was awarded to an individual with higher seniority than either Caldwell, Derrington or Middleton.

The master was correct in using February 22, 1977 as the cut-off date for damages. Neither Caldwell, Derrington nor Middleton had a reasonable expectation of obtaining the Wheatley run after February 22, 1977 since bids were ordinarily awarded for a one year period. They voluntarily gave up the run to Patterson, an individual with lower seniority. Thus, they did not lose a bid run as a result of the change of operations, but voluntarily chose not to accept one. The Court notes, moreover, that Derrington, Caldwell and Middleton voluntarily elected not to bid for the Wheatley run on May 13, 1977.

Arkansas-Best has moved to set aside the finding of liability or, in the alternative, to amend the Court's findings to apportion damages among the defendants according to fault. The labor defendants agree that there is no basis for awarding damages against any defendant, but opposed the motion to apportion damages.

Arkansas-Best argues, in essence, that it should not be held liable because it had little or no involvement in the conduct upon which the Court based its liability findings, and the conduct that it was involved in was undertaken in good faith reliance on the decision of the contractual arbitration process. All of the defendants

contend that since the decision to seek a change of operations was not improperly motivated and since the result reached by the change of operations committee was a permissible one that they should be exonerated from liability.

The Court disagrees with Arkansas-Best's characterization of its role in the change of operations procedure. Its role was not one of mere good faith passive acquiescence in the committee's decision. Arkansas-Best aggressively sought the change and, in furtherance of its plan, sought out members of the change of operations committee prior to the hearing in an attempt to secure their approval. This conduct was sufficient to constitute a violation of the collective bargaining agreement. The Court has previously considered and disposed of the argument that there can be no liability if the result was a permissible one under the contract in its memorandum incorporated in the Findings of Fact and Conclusions of Law. No useful purpose would be served by reiterating the analysis here. Thus, the Court denies Arkansas-Best's motion to set aside the liability findings.

The Court likewise denies Arkansas-Best's motion to apportion damages among the defendants according to their relative fault. Each of the violations set forth in the Court's Findings of Fact and Conclusions of Law, standing alone, is sufficient for supporting the Court's remedy. This Supplemental Memorandum is incorporated in the Supplemental Findings of Fact and Conclusions of Law.

A final judgment will be entered in accordance with the Findings of Fact and Conclusions of Law, and the Supplemental Findings of Fact and Conclusions of Law.