Cletus KING, Robert Tinney, Robert Ranniger, Appellants,

v.

SPACE CARRIERS, INC., and Teamster General Drivers Union, Local No. 120, Appellees.

No. 78–1873.

United States Court of Appeals, Eighth Circuit.

Submitted April 20, 1979.

Decided Oct. 16, 1979.

---

Stanley J. Mosio, St. Paul, Minn., for appellants.

Bruce A. Finzen, St. Paul, Minn., for appellee, Teamster Gen. Drivers Union Local 120.

Robins, Davis & Lyons, St. Paul, Minn. and Emery W. Bartle, Minneapolis, Minn., argued, Jay L. Bennett, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., on brief, for Space Carriers, Inc.

Before LAY, HEANEY and McMILLIAN, Circuit Judges.

HEANEY, Circuit Judge.

The plaintiffs, Cletus King, Robert Tinney and Robert Ranniger, appeal from the District Court's grant of summary judgment in favor of Teamsters General Drivers Union, Local No. 120 and Space Carriers, Inc. The action was brought by the plaintiffs as employees of Space Carriers and members of Local No. 120 alleging a breach of the Union's duty of fair representation

and a breach of a collective bargaining agreement in violation of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. On appeal, the plaintiffs contend that the trial court erred in failing to find that Local No. 120 breached its duty of fair representation (1) by agreeing to dovetail the seniority lists of Space Carriers, Inc., and Space Center Transport, Inc., and (2) by the manner in which the Union dealt with the plaintiffs' grievances objecting to the dovetailing. They also contend that dovetailing the seniority lists breached the collective bargaining agreement between Local No. 120 and Space Carriers, Inc.

In 1970, the St. Paul Terminal Warehouse Company, an intrastate cartage company, organized a subsidiary corporation, now named Space Center Transport, Inc. (Transport), to handle the intrastate freight that the parent company was hauling. St. Paul Terminal Warehouse Company then obtained authority to operate as an over-the-road interstate company and subsequently organized another subsidiary, Space Carriers, Inc. (Carriers), to operate the interstate routes. Local No. 120 is the collective bargaining representative for the employees of both Transport and Carriers.[1]

This action centers around an April 22, 1977, letter of understanding between the Union and the two companies. The letter provided that seniority lists of Carriers and Transport would be dovetailed once a year for job bidding purposes. The plaintiffs, drivers at Carriers, contend that Local No. 120 breached its duty of fair representation by entering into this agreement. Local No. 120 argues that the agreement was entered into for the legitimate objective of balancing the seniority rights of drivers at Carriers as well as Transport, and that its actions were within its discretion in administration of the collective bargaining agreement.

The seniority problem began in 1976, when a dispute arose over whether a St. Paul-New Ulm route should be driven by the drivers of Transport or Carriers. The freight on this route was both interstate and intrastate in nature.[2] The first grievance growing out of this dispute was resolved by an agreement to lease the necessary operating authority to Transport.[3] This agreement was challenged by a second grievance. The grievant claimed that since interstate freight was being hauled, the route should be reassigned to Carriers, it being an interstate operator. Pursuant to the National Master Freight Agreement, the collective bargaining agreement in effect between the companies and the Union, the grievance was arbitrated before the Joint State Grievance Committee (JSGC), which voted to assign the route to Carriers.[4] The JSGC directed, however, that one Transport employee be transferred to Carriers and be dovetailed into its seniority list. This employee's seniority was to be determined from the date of his original employment with the St. Paul Terminal Warehouse Company.[5] As a result of this decision, Mark Connolly, the most senior driver at Transport, transferred and became the

---

1. When the new company was formed in 1970, a letter of understanding was entered into between the Union and the employer providing that the parties would be bound by the National Master Freight Agreement and the local area supplement.

2. The route had previously been driven by a Transport driver. When the run began to include interstate freight, it was assigned to Carriers. The Interstate Commerce Commission later issued an opinion that an interstate license was needed to haul freight on this route.

3. A Transport driver had filed this grievance claiming the run should be driven by a Transport employee.

4. The JSGC found that, under the Interstate Commerce Commission regulations, interstate authority was needed for the route.

5. Giving the transferring driver seniority from the date of his original employment rather than from the date of the transfer appears to be inconsistent with a September 17, 1973, letter of understanding between the Union and the companies. The 1973 letter outlined the procedure for the transfer of Transport drivers to Carriers. The letter provided that any transferring driver would have seniority for job bidding purposes beginning on the date of the driver's transfer, while seniority for all other purposes would be based on the date of the driver's original employment with the old St. Paul Terminal Warehouse Company.

top driver on Carriers' seniority list. The other drivers at Carriers then expressed their dissatisfaction with being placed behind Connolly on the seniority list.

Local No. 120 president, Harold Yates, and business agent, Raymond Hogan, believed that inequities had resulted from the arbitration decisions because some drivers could use their master seniority date for bidding purposes in either company, while others could not. They felt the best solution was to dovetail the two seniority lists. They presented the matter to the drivers of Carriers and Transport, and a majority of the drivers voted in favor of the arrangement. The Union vote led to the April 22, 1977, letter of understanding to dovetail the seniority lists, which the plaintiffs are challenging in this action.

On April 30, 1977, the bidding for runs was held in accordance with the letter of understanding. The plaintiffs were present at the bid meeting but refused to bid.

On May 3, 1977, the plaintiffs and some other Carriers' drivers filed a grievance protesting the April 22, 1977, agreement to dovetail the seniority lists. This grievance was heard by the JSGC.[6] The plaintiffs appeared before the JSGC, testified, and had the grievance presented by Local No. 120's business agent, Hogan. Nevertheless, the JSGC denied the grievance. Shortly thereafter, one of the grievants discussed with president Yates the drivers' unhappiness with the JSGC decision. The drivers sought Yates' approval and help to get the grievance heard by the Joint Area Grievance Committee (JAGC) in Chicago. Although the collective bargaining agreement

did not provide for a second hearing in this case,[7] Yates agreed to this plan and obtained the companies' approval. A hearing was held before the JAGC. The plaintiffs were present at this hearing and had the opportunity to testify but did not take advantage of it. The JAGC voted to deny the grievance.

The plaintiffs then commenced this action in District Court. Both parties moved for summary judgment. After a hearing on the matter, the District Court made findings of fact and conclusions of law. It held that

[t]he conduct of the Union in entering into the Letter [agreement] was not arbitrary, discriminatory or in bad faith but was a good faith action taken by the Union consistent with the latitude and discretion allowed to collective bargaining representatives to fairly and adequately protect the interests of all members which it represents.

It found that the Local sought the dovetailing to correct the inequities that arose after Connolly had been allowed to take his master seniority to Carriers for bidding purposes while other employees were refused that right. It further found that the relationship between Carriers and Transport was such that the companies were not entitled to separate seniority lists under the National Master Freight Agreement.

The plaintiffs contend on appeal that the trial court erred in failing to hold that Local No. 120 breached its duty of fair representation by entering into the April 22, 1977, letter of understanding which dovetailed the seniority lists of Carriers and

---

**6.** Under the collective bargaining agreement, the JSGC hears and decides a grievance. Article 45, Section 1(b) of the Central States Area Supplemental Agreement provides:

Section 1. Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties, the following procedure shall then apply:

\* \* \* \* \* \*

(b) Where a Joint Local Area Committee is unable to agree or come to a decision on a case, or where there is no such committee, it shall, at the request of the Union or the Employer involved, be appealed to the Joint

State Cartage Committee at the next regular constituted session. Minutes of the local committee shall set forth the position and facts relied on by each party, but each party may supplement such minutes at the hearing before the Joint State Cartage Committee.

**7.** Under the National Master Freight Agreement and the Central States Area Local Cartage Supplement Agreement, only a grievance that is deadlocked before the JSGC may be heard by the JAGC. See Article 45, Section 1(d). The grievance of the Carriers' drivers had been denied by a majority vote.

Transport drivers. The guideline for determining whether a union fairly represents its members has been articulated by the Supreme Court many times. *See, e. g., Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); *Steele v. Louisville & Nashville R. R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). The duty of the union is to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes, supra* at 177, 87 S.Ct. at 910. A breach of this obligation occurs when "a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916. *See also Florey v. Air Line Pilots Ass'n. Intern.*, 575 F.2d 673 (8th Cir. 1978); *Russom v. Sears, Roebuck & Co.*, 558 F.2d 439 (8th Cir.), *cert. denied*, 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977); *Augspurger v. Brotherhood of Locomotive Engineers*, 510 F.2d 853 (8th Cir. 1975).

The Supreme Court has recognized the broad authority of a union in dealing with seniority questions. *Humphrey v. Moore, supra; Ford Motor Co. v. Huffman, supra.* It stated:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty or purpose in the exercise of its discretion.

*Ford Motor Co. v. Huffman, supra* at 338, 73 S.Ct. at 686; *see Mavis v. Brotherhood of Ry., Airline & S. S. Clerks*, 585 F.2d 926 (8th Cir. 1978).

Here, the District Court properly held that the Union acted in a reasonable way. The collective bargaining history supports the court's view that Carriers and Transport were in reality a single employer and should be treated as such; past efforts to deal with seniority questions on a piecemeal basis had proved to be unsatisfactory and totally divisive; while some employees had their seniority temporarily affected, none of them lost that seniority by virtue of the agreement; and the Union acted honestly and in good faith.

The plaintiffs also contend that the letter agreement dovetailing the seniority violated Article 5, Section 2(b)(1) of the National Master Freight Agreement. That section provides that "the active employee seniority rosters * * * shall be 'dovetailed' by appropriate classification (i. e., road or city) in the order of each employee's full continuous classification (road or city) seniority date that the employee is currently exercising." They argue that a union and an employer cannot take away seniority rights guaranteed in a collective bargaining agreement by revising that agreement in mid-term, even if the mid-term agreement is approved by a majority of the union. Whatever validity there may be to that argument in other cases, it is not controlling here.

First, the Article is directed at situations in which the terminals or operations of two separate and distinct companies are combined. In this case, as the trial court correctly found, the two companies involved are, in fact, corporate divisions of a single company; the divisions' labor relations policies are controlled by the parent; and there is a history of employees being transferred from one of the divisions to the other with varying results as to seniority rights.

Second, Article 5, Section 4, of the National Master Freight Agreement states that

> The parties acknowledge that questions of the application of seniority rights may arise which require different treatment and it is anticipated and understood that

the Employers and Unions jointly involved and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances.

This clause clearly modifies Article 5, Section 2(b)(1). While it does not give the employers and the Union carte blanche to ignore the agreement, it must be given effect when the action taken pursuant to it is reasonable and in good faith, as was the case here. *Cf. Kirkland et al. v. Arkansas-Best Freight System, Inc., et al.,* 475 F.Supp. 180 (E.D.Ark., 1978) (supplemental findings, conclusions and memorandum, June 25, 1979).

The plaintiffs next contend that Local No. 120 breached its duty of fair representation by the manner in which it handled their grievances. The plaintiffs first claim that the Union breached its duty when its president, Harold Yates, opposed their grievance before the JSGC.

■ Generally, a union has a duty to fairly represent its members in the arbitration process and not to act in bad faith, arbitrarily or discriminatorily. *Hines v. Anchor Motor Freight, Inc., supra; Keppard v. International Harvester Co.,* 581 F.2d 764 (9th Cir. 1978); *Butler v. Local U. 823, Int. Bro. of Teamsters, etc.,* 514 F.2d 442 (8th Cir.), cert. denied, 423 U.S. 924, 96 S.Ct. 265, 46 L.Ed.2d 249 (1975). This includes the duty not to process the grievance in a perfunctory manner. *Vaca v. Sipes, supra; Ethier v. United States Postal Service,* 590 F.2d 733 (8th Cir. 1979). The propriety of a union's opposition to a grievance, such as Yates' statements before the JSGC, was recognized in *Humphrey v. Moore, supra.* The Court stated:

> [W]e are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another.

345 U.S. at 349, 84 S.Ct. at 371.

The Court then discussed the role of the union in the grievance process:

> Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes.

*Id.* at 349–350, 84 S.Ct. at 372.

We thus find no merit to the contention that Local No. 120 breached its duty when its president did nothing more than voice his opposition to the plaintiffs' grievance when it was heard before the JSGC.

■ The plaintiffs also challenge the involvement of business agent Hogan, claiming that since Hogan represents other members of Local No. 120 as well as the plaintiffs, a conflict of interest existed when he presented the grievance to the JSGC. The plaintiffs have not argued that any facts or issues were omitted by Hogan or that his presentation of the facts was defective in any way. The parties were present at both hearings and either testified or were asked if they had anything to add. *Cf. Charles W. Smith, et al. v. Hussmann Refrigerator Company, et al.,* Nos. 78–1034, 78–1073, 78–1092 (8th Cir., Jan. 3, 1979). The plaintiffs did not request different representation and do not allege "what they could have added to the hearing by way of facts or theory if they had been differently represented." *Humphrey v. Moore, supra,* at 350–51, 84 S.Ct. at 372.

■ The Union claims its good faith handling of the grievances is demonstrated by its efforts to have a hearing before the JAGC. Under the National Master Freight Agreement, there is no right to appeal a grievance to the JAGC from the JSGC unless the JSGC is deadlocked. Here, the grievance had been denied by a majority vote. Yet, Local No. 120 agreed to a hearing before the JAGC and obtained Carriers'

approval of the plan, even though it had no obligation to do so under the contract. Action of this type by the Union does not show the hostile motives or bad faith the plaintiffs are required to demonstrate or allege.

The plaintiffs also contend that Carriers, their employer, breached the collective bargaining agreement by entering into the April 22, 1977, letter of understanding that dovetailed the seniority lists.

An employer is generally allowed to rely on the finality provision of a grievance and arbitration clause in a collective bargaining agreement. *Hines v. Anchor Motor Freight, Inc., supra; Vaca v. Sipes, supra.* But when the contractual process has been "seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct," *Hines v. Anchor Motor Freight, Inc., supra* at 570, 96 S.Ct. at 1059, the union's breach "removes the bar of the finality provisions of the contract." *Id.* at 567, 96 S.Ct. at 1058. In order to avoid the finality of the grievance process and sue Carriers for breach of the contract, however, the plaintiffs must first show that Local No. 120 breached its duty of fair representation. *Id.* at 570, 96 S.Ct. 1048; *Barrett v. Safeway Stores, Inc.,* 538 F.2d 1311, 1315 n.3 (8th Cir. 1976); *Butler v. Local U. 823, Int. Bro. of Teamsters, etc., supra* at 453. *See also Keppard v. International Harvester Co., supra; Baldini v. Local U. No. 1095, Intern. U., etc.,* 581 F.2d 145 (7th Cir. 1978).

Since we agree with the District Court's finding that Local No. 120 did not breach its duty of fair representation, we affirm the decision to dismiss Carriers.