Thomas WATERS, Jr. and John H. Rowland, Plaintiffs,

v.

OLINKRAFT, INC. and Local 266 of the United Brotherhood of Carpenters & Joiners of America, AFL–CIO, Defendants.

No. ED–74–61–C.

United States District Court, W. D. Arkansas, El Dorado Division.

June 25, 1979.

John W. Walker, Henry L. Jones, Jr., Walker, Hollingsworth & Jones, Little Rock, Ark., for plaintiffs.

W. Dent Gitchel, Little Rock, Ark., Peyton Lacy, Jr., West Monroe, La., William L. Massey, Pamela D. Walker, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

This action was commenced by complaint filed October 15, 1974, by plaintiffs, Waters and Rowland, as a class action pursuant to the Civil Rights Acts of 1964 and 1866 and to 29 U.S.C. § 151. Plaintiffs allege discrimination due to race by defendants Olinkraft and the local Union, and lack of fair representation by the Union. The class sought to be certified is composed of black persons who are employed, have sought to be employed, and who might seek employment at the facilities of defendant Olinkraft at Huttig, Arkansas. Plaintiffs seek a declaratory judgment, back pay, injunctive relief and an award of attorney fees.

It is alleged that plaintiffs are black employees of the defendant Olinkraft and members of defendant Union, that they have filed charges of discrimination with EEOC and have been issued "right to sue" letters. The primary focus of the complaint is toward alleged discrimination in hiring and promotion of blacks to supervisory, clerical, managerial and higher paid maintenance positions.

Defendant Union denied any inequality of representation or participation in any acts of discrimination. Olinkraft denied all allegations of the complaint, except the receipt of EEOC right to sue letters and its status as an "employer" within the ambit of the Civil Rights Act of 1964. Olinkraft denies that this is a proper class action, states that the action is barred by failure to file the complaint within the time limits established by the 1964 Civil Rights Act, and asserts the applicable statute of limitations as to any award of back pay which might result under either 42 U.S.C. § 2000e or 42 U.S.C. § 1981, under which plaintiffs also claim.

By order of October 23, 1975, this Court conditionally certified the proceeding as an appropriate class action, pursuant to Rule 23, Federal Rules of Civil Procedure. An Order was entered March 1, 1977, denying the motion of the defendant for summary judgment. After completion of extensive discovery, the cause was regularly set for trial on the merits without a jury. Trial was commenced on May 18, 1978, and was concluded on May 24, 1978.

Plaintiffs were present and represented by Hon. John W. Walker and Hon. Henry L. Jones. Defendant Olinkraft was represented by Hon. W. Dent Gitchel and Hon. Peyton Lacy, Jr. Defendant Union was represented by Ms. Pam Walker. After the presentation of testimony and exhibits by the

parties, the record was permitted to remain open for the receipt of further affidavits, exhibits and briefs of counsel. The parties were allowed additional time for the preparation of suggested findings of fact, conclusions of law, and briefs in support thereof.

Counsel for defendants have presented detailed suggested findings and conclusions, supported by substantial briefs as to their analysis of the evidence and the applicable law. Counsel for plaintiffs, however, have submitted only bare and sparse suggested findings and conclusions, without supporting brief as to the applicable law or analysis of the evidence in support of their contentions. Even this was forthcoming long after the date established by the Court.

The failure of counsel for plaintiff to present a brief analyzing the record and setting out the evidence contended to support the suggested findings and conclusions, and failure to adhere to the briefing schedule established by the Court, has worked an undue burden upon the Court in its review of this extensive record. This lack of due diligence has not afforded plaintiffs and the class the full and fair representation to which they are entitled in an important proceeding.

The Court has carefully reviewed the pleadings, exhibits, testimony, proposed findings and conclusions, briefs, and the authorities. Pursuant to such review, the Court makes the following findings of fact and conclusions of law, which are incorporated herein pursuant to Rule 52, F.R.C.P.:

This Court has jurisdiction of this proceeding pursuant to 42 U.S.C. § 2000e, all jurisdictional requisites having been met pursuant to the 1964 Civil Rights Act. Jurisdiction as to defendant Union is further provided by 29 U.S.C. § 185.

Plaintiffs are employed by defendant Olinkraft, and are members of defendant Union, at the Olinkraft sawmill and plywood mill operations located at Huttig, Arkansas. The entire Huttig operations of Olinkraft are under one manager, with a small clerical staff, a small management unit, and supervisory personnel.

Logs are received by Olinkraft in the log handling department, which unloads, stores, debarks and delivers the logs to both the sawmill and the plywood mill. The plywood mill and the sawmill are operated essentially as separate entities, requiring different machinery, processes and skills in the operation and maintenance of the facilities. Exhibit 11 to the Answers to Interrogatories filed by Olinkraft on February 3, 1976, summarizes the various departments of the two facilities and gives an insight as to the overall operations.

The Labor Agreements made a part of the record herein as Plaintiffs' Exhibit Nos. 11 and 12 set out in detail a full and descriptive breakdown of the various classifications of types of employment and wage rates prescribed therefor within the entire hourly workforce at Huttig. A brief summary of these occupational classifications might be helpful in the understanding of a review of the testimony.

In the sawmill, the various departments and job classes are:

| | |
|---|---|
| Misc. Labor . . . | Utility Labor |
| Shop Maintenance . . . | Millwright |
| | Plumber-pipefitter |
| | Trainee |
| | Carpenter Helper |
| Log Handling . . . | Dock Grapple Operator |
| | Dock Saw Operator |
| | Chipper Feeder |
| | Utility Labor |
| Planer-Shipping . . . | Head Machine Setup |
| | Grader A |
| | Double End Trimmer |
| | Feeder |
| | Rip Trim Saw Operator |
| | Lumber Puller |
| | Utility Labor |
| Green Lumber . . . | Sawyer |
| | Fireman Helper |
| | Extra Man |
| | Chipper Operator |
| | Edger Man |
| | Resaw Operator |
| | Unscrambler |
| | Sticklayer |
| | Utility Labor |

In the plywood mill, departments and job classes are:

| | |
|---|---|
| Green End Dept. . . . | Lathe Operator |
| | Block Scaler |
| | Clipper Operator |
| | Forklift Operator |

Green End Dept.—Cont'd 
Onman-Offbearer 
Stud Operator 
Chain Puller 
Leadman 
Utility Labor 

Dry End, Layup, Pressing . . . 
Core Layer 
Core Feeder 
Dry Tender 
Forklift Operator A 
String Machine 
Press Helper 
Dry Grader 
Dryer Offbearer 
Dryer Feeder 
Utility Labor 

Plywood Finishing & Shipping . . . 
Saw Panel Grader 
Forklift Operator 
Utility Labor 

The sawmill was purchased by Olinkraft in 1956 and the plywood plant was constructed and placed in operation during September, 1970. Labor Agreements between Olinkraft and the Union provide for and govern job classifications, wage rates, promotion systems, seniority, bid systems, posting of available vacancies for bid, and generally and specifically provide for and govern relations between Olinkraft and the hourly wage workforce at the facility, and promotions, transfers, advancements, layoffs, grievances, work rules, etc. . . . are spelled out in those agreements in considerable detail.

After hourly employees are initially hired into the sawmill, promotions are based on the posting of all job vacancies and bidding for vacancies by employees. Pursuant to the Labor Agreements, success in bidding is to be based upon skills, experience and ability to perform the job. If these factors are essentially equal, the employee with the most company seniority is awarded the job. All new and inexperienced employees are hired into utility labor and promoted from that position to other departments.

In the plywood mill, under the Labor Agreements, vacancies are filled through lines of progression in the various departments as they occur on the basis of seniority, with the sole exception of the maintenance department, where vacancies are posted and may be bid upon by all employees. New hires of inexperienced workers are placed in the utility labor job in the department where the vacancy exists, and are promotable ordinarily in the line of progression of that department as vacancies occur.

Under the Labor Agreement, in both sawmill and plywood, all promotions within the hourly labor force covered by the Agreements are from within the existing employees, with the exception of maintenance job classifications. If no bids are received on maintenance vacancies from qualified employees, Olinkraft is permitted to seek persons with those skills and experience outside the plant. Many of the complaints of the black employees, and the charges of the plaintiffs, arise out of bidding for maintenance jobs and the hire of persons to fill these vacancies from outside the workforce.

The supervisors of the hourly wage employees are not covered by the Labor Agreement and are salaried employees. The efforts of members of the hourly wage employee group to become supervisors have also resulted in complaints of a number of the witnesses at the trial. The informal procedures for selection, training and transfer of members of the hourly paid workforce to supervisory positions present the most serious questions of discrimination in this litigation, as perceived by the Court.

A total of seven office and clerical personnel are employed at the Huttig facility. All of these positions have been held by whites. During the relevant time period, from 1971 through the date of trial, no vacancy has existed at any of these positions for which a black could have applied or been hired. By affidavit made a part of the record subsequent to trial, without objection on the part of plaintiffs, it is shown that one of the clerical positions became vacant and that the vacancy was filled by a black female.

A nurse, who also assists the personnel director, is employed at the facility. This position has always been held by a white female. The position became vacant within the time period being considered, the vacancy was advertised in a local newspaper, and no black applied. The vacancy was filled by a white female.

The position of personnel director at the facility became vacant. An effort was made to recruit a black qualified to perform the duties and a black was offered the position, but declined to accept. The position was then filled by a white who was not offered better terms.

Huttig is a small town, population some 1100, situated in extreme Southeast Union County, Arkansas. It is somewhat isolated geographically by the Ouachita River to its East and North. It is situated some 30 miles Southeast of El Dorado, some 50 road miles from Crossett, Arkansas, some 16 miles from the small town of Marion, Louisiana and 12 miles from the small Union County town of Strong, Arkansas. With its small size, its relative isolation, and the relatively low wages paid at the Olinkraft facility, the labor market for the facility is somewhat restricted and recruiting difficult.

Dr. Charles T. Kenny, a highly qualified expert in the field of industrial personnel consultation, testing, statistics and industrial psychology, testified on behalf of defendant Olinkraft. No statistical data or analysis was presented on behalf of plaintiffs. Dr. Kenny testified to analyses of data as to the composition, utilization, terminations, hiring, promotions, demotions and layoffs at Olinkraft, which analyses are set out in various exhibits received with his testimony. Defendant's Exhibit No. 26 through 44 summarize the testimony of the witness, and show the exhaustive and detailed analysis made of the available labor force in the area, the work force at Olinkraft and the factors developed and considered by the witness in his study. Dr. Kenny stated that in his opinion the statistics revealed no significant evidence of underutilization of blacks in the work force, no evidence of discrimination against blacks in hiring, promotion, reprimands, layoffs, terminations, and no evidence of disparate treatment of blacks in any manner.

Plaintiffs proceeded on a novel theory, that the percentage of blacks in supervision, clerical and management should be equal to the percentage of blacks in the hourly work force. They failed to cite any statutory or case authority for this theory, or to rebut in any way the data and testimony of Dr. Kenny with regard to the availability of blacks qualified for such positions in the labor pool in the area from which Olinkraft might realistically recruit employees. Statistics may be significant to indicate whether blacks are employed in numbers and percentages comparable to their availability in the work force of the area from which employees are drawn, *Hazelwood School District v. U. S.*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). In this case, the statistics clearly indicate that the only significant disparities are in employment of a greater number of blacks, in positions of higher skills and pay, than would be anticipated on the basis of their number and percentage with such skills in the area.

There being no inference or presumption of discrimination on the basis of statistical data, the Court must examine the testimony to determine whether individual acts of racial discrimination or a pattern of discrimination are shown. Plaintiffs Thomas Waters, Jr., and John H. Rowland filed identical charges of discrimination with EEOC, alleging that:

"1. Blacks are relegated to menial and low paying positions requiring the hardest physical labor.

2. Blacks are not considered or employed as managerial, supervisory, clerical or professional employees. White employees with lesser skills, ability and seniority are consistently promoted over black employees.

3. Blacks are not hired for higher paying positions nor or (sic) incumbent blacks promoted to higher paying positions.

4. Seniority systems operate to keep blacks in what are considered to be all black jobs, classifications, and departments.

5. The Union has acquiesced in all of the above acts and does not represent its black members fairly and equally."

These charges were filed May 13, 1973, after plaintiffs Waters and Rowland had

both bid for and been denied a position in the maintenance department of the sawmill. EEOC, after investigation, made a determination of no discrimination and issued to plaintiffs a "right to sue" notice on July 17, 1974. Their complaint herein was filed on October 15, 1974, within 90 days after receipt of the "right to sue" letters.

Plaintiff John H. Rowland was employed by Olinkraft in 1948 as a laborer. By 1961 he had progressed to grader and by 1967 to trimmer operator. In 1973 he bid on a millwright position in the planer department of the sawmill. Plaintiff Thomas Waters, Jr., had also bid on the same job. Waters was employed by Olinkraft in 1962 as a laborer and was junior in seniority to Rowland and to white employee James Hanna, who had also bid for the position.

The millwright position was awarded to Hanna, who had previous experience as a millwright, while Rowland had none. The personnel director, after his interview with Rowland, made a written memorandum of the interview wherein he noted that Rowland admitted his lack of ability to perform the duties of the millwright position, but expressed an interest in bidding on a position as helper or trainee whereby he might become qualified for a future millwright position. Within less than one month, Rowland was awarded a position as millwright helper in the planer department of the sawmill and advanced to the position of millwright in the planer mill.

In April of 1978 Rowland bid for a welder-maintenance "A" position in the plywood plant. He was asked by the new maintenance superintendent to demonstrate minimum welding skills by making a "coupon bend" weld. This test was required by the new superintendent of all applicants for maintenance positions which require welding skills. The test does not require interpretation, after the metal plates are welded, they are placed in a press and bent. If the weld breaks, the weld was defective. If the weld does not break, the test is passed. Rowland's weld broke and he was not awarded the welding job he had bid for.

Rowland complained that other blacks had applied for promotions and were not awarded them, despite greater seniority. He also complained of lack of black supervisors. Specifically, he complained about denials of promotion to one C. V. Thompson.

■ The Court finds that the failure of Mr. Rowland to be awarded the millwright job bid for was not the result of discrimination because of his race. Although he had greater seniority, the next senior bidder had experience applicable to the position bid for, which Rowland did not. The company was following its stated policy, as contained in the Labor Agreement, in awarding the bid to the bidder having the greater skills, experience and ability to perform the job, with seniority playing a part in the award where skills and experience are essentially equal. Clearly, as he expressly recognized in his interview with the personnel director after his bid and before the award, he was not qualified for the millwright job.

He requested an opportunity to bid on a millwright helper job, so that he could receive "on-the-job" training. Although the company was not bound to create such a position, and none was provided for in the Labor Agreement, such a position was in fact made for Rowland, he was awarded the job, and worked his way into the millwright position. Again, when he bid on the welder-maintenance job in 1978, he was passed over for the award because of his lack of welding skill, rather than because of his race. The welding test utilized is accepted through common usage in industry, is simple, tests minimal welding skills, is administered to all bidders or applicants for jobs requiring welding, and is entirely objective in interpretation. If the weld breaks the test is failed, if it holds the test is passed. The test is nondiscriminatory in form and application.

Plaintiff Thomas Waters, Jr., was employed by Olinkraft in 1962 as a laborer. Olinkraft posted a job of millwright-helper in 1973. Waters protested that such a job was not provided for in the Labor Agreement, through his Union, and the opening was re-posted as millwright. Waters, as

well as Rowland, James Hanna and W. R. Persley, bid on the job. Both Rowland and Hanna had far more seniority than Waters, and Hanna had prior experience and skills as a millwright. Hanna was awarded the position.

Shortly thereafter, the personnel director having been informed by Waters that he had taken a welding course at a vocational technical school, Waters bid for and was awarded a welder-maintenance "A" job. The Court concludes that the failure of Waters to obtain the millwright job bid for in 1973 was not due to discrimination, but due to an award to a more experienced and skilled employee, with greater seniority. The testimony of both Rowland and Waters indicates that the job awarded Waters is superior to and higher paying than that which was awarded to Hanna.

Neither of the named plaintiffs, Waters or Rowland, has ever applied for a supervisory position, and Waters stated that as of the time of trial he did not want such a position. Both, however, would appear to meet the qualifications for such a position, being at the top of the hourly employee progression with seniority and skills commensurate with such positions. Plaintiffs would appear to be representative of persons who are qualified and eligible to become supervisors, and familiar with the duties, responsibilities and qualifications required.

■ The plaintiffs are not representative of applicants for clerical positions in the management unit, which is separate and distinct from the hourly wage bargaining unit. Their claims and charges deriving from their own knowledge and their own experiences are not typical of any member of the clerical force. The plaintiffs cannot meet the standards of representation set out in Rule 23, F.R.C.P., as to clerical applicants. Further, it appears to the Court that there have been no vacancies in such positions within the applicable time period and until after the date of trial. By affidavit filed subsequent to the trial, without objection on the part of plaintiffs, it is shown that a vacancy did occur in one of the clerical jobs and that a black female was employed.

Further, plaintiffs do not meet the standards to be held representative of applicants for employment in the management unit. There are only a very few persons in that unit, the manager of the overall operation, a superintendent for each of the two plants, sawmill and plywood, the personnel director and his assistant, who is also qualified and employed as nurse for the operations. The position of personnel director became vacant, a qualified black was recruited and was tendered the position, but declined. A white was then hired at the same rate of compensation. The nurse-personnel assistant position became vacant, the position was advertised in a newspaper in El Dorado, and the only applicant, a white LPN was hired.

Plaintiffs do not contend that they are qualified for any of these positions, they are not knowledgable of requirements of these positions, vacancies have been few and filled without exclusion of blacks from the selection process, and no person appeared who contended that they had been denied employment for a vacancy in any such position where a vacancy existed, on the basis of race.

■ The record clearly requires the finding that Olinkraft does not discriminate against blacks in initial hire into the bargaining unit, hourly paid jobs. With the exception of some skilled positions in maintenance, all hires into these jobs are at the entry level, labor. The work force is predominately black, with blacks holding a high proportion of the operator positions, the best paying jobs outside maintenance. Promotion within the bargaining unit is conducted in a manner established in the collective bargaining agreements, weighted by seniority, without regard to race. No person appeared to contend that they were denied an application for employment into the bargaining unit. Plaintiffs thus cannot represent a class of rejected applicants for employment or rejected applicants for promotion within the bargaining unit, with the limited exception of applicants for promo-

tion from within the bargaining unit into maintenance jobs.

■ As to applicants for promotion into maintenance, plaintiffs are qualified to be representative of a class of rejected applicants for positions in maintenance as to both sawmill and plywood. Plaintiffs are also so situated as to be representative of persons who might be applicants for positions as supervisors in each of the operations. The class which plaintiffs may represent in these proceedings is, therefore, certified and defined, pursuant to Rule 23, F.R.C.P., as black applicants from within the bargaining unit for positions in maintenance and for positions in direct supervision of hourly wage unit employees, at the facilities of Olinkraft at Huttig, Arkansas. The teachings of *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) and *Walker v. World Tire Corp.*, 563 F.2d 918 (8 Cir. 1977), appear to the Court to require and support such findings.

The testimony of those who appeared to give evidence of alleged acts of discrimination by Olinkraft and/or the Union has been examined in detail. Ollie Thompson and Acie Malone, testified that they had been fired for admittedly drinking intoxicating liquor during working hours. They admit that the employer has a firm rule prohibiting such practice, but claim that the rule is applied in a discriminatory manner, in that some whites who violate the rule have not been discharged. It is also contended that the Union did not properly represent them in processing their grievance proceeding arising out of their discharge. The evidence does not support a finding of discrimination in the discharge of these employees, or in the handling of their grievance by the Union. It is shown that whites discovered violating the rule have also been discharged.

By affidavit filed subsequent to the trial, without any objection on the part of plaintiffs, it is shown that Olinkraft agreed to permit their grievance under the Labor Agreement to be filed out of time, on the basis that the evidence at trial demonstrat-ed that discharge procedures set up by the Agreement had not been followed in detail. Pursuant thereto, these two individuals have been reinstated in their former jobs with full seniority, and have agreed to accept $250.00 back pay in full settlement of their entitlements.

Aubrey Rowland, a black employee holding the job of lathe operator in plywood, was an applicant for maintenance. He is not·qualified as a welder, mechanic or electrician and is not, therefore, qualified to hold a class "A" maintenance job. He would not take a maintenance trainee position, as this would require a cut in his pay until he became qualified for a class "A" position and an opening occurred. His present pay scale as lathe operator is the highest in the plant other than the class "A" maintenance jobs. The Court concludes that this individual has not been the subject of racial discrimination.

James Hall is a plywood lift truck operator.. He applied for a maintenance job, but had no skills, training or experience in welding or as a mechanic which would qualify him for any of the maintenance positions. Willie Lee McHenry, a black employee, bid on a maintenance electrician position, but admitted that he had no skill, experience or training as an electrician. Whites who were promoted into these positions or hired from outside the bargaining unit were qualified by skills, training or by prior experience. There was, however, evidence from which the Court finds that blacks had, prior to the applicable period of time involved in this litigation, been discouraged from applying for maintenance positions, or not been·informed of maintenance vacancies for which they might have applied.

More recently, and at all times within the time frame of this litigation, openings in the bargaining unit, including maintenance positions, have been posted and are available for bids by blacks and whites on an equal basis. Promotions to higher hourly wage positions in the bargaining unit are made in accordance with the Labor Agreements on a non-discriminatory basis.

Recent promotions into maintenance positions have also been non-discriminatory.

Paul Manning, the sawmill carpenter, is black. He was promoted to that maintenance job in 1971 when his white predecessor died. Frankie Briggs, black, obtained a welder-maintenance "A" job after bidding into a maintenance trainee position and demonstrating his skill and competence. Plaintiffs Waters and Rowland have been promoted into maintenance. David Murray, white, was hired from outside the plant as a welder-maintenance "A" on two occasions. Although he had held the position in the past and had taken welding training for two years and worked as a welder, he was required to take the same test of his skill at welding as required of Rowland, before his re-hire.

Olinkraft purports to have adopted an "affirmative action" program to hire and promote qualified blacks. From the evidence the Court finds that the recruiting procedure for securing applicants outside the plant has been largely by word of mouth, by means of white employees to their acquaintances. This has resulted, naturally, in virtually all white applicants for skilled, supervisory and maintenance positions when these jobs are not filled by employees from within the bargaining unit. There was testimony that posting of supervisory and maintenance job vacancies has not always been done in accordance with the Labor Agreement.

■ Although Olinkraft presented statistical evidence that blacks are utilized in supervisory positions in percentages which are consonant with the availability of black supervisors in the general working population of Union County, the Court finds that qualified blacks are available at a higher rate and in greater numbers within the hourly work force at the facility. The Court is convinced by the evidence that there are a number of black employees who are employed as skilled operatives and who are well qualified to serve as supervisors by virtue of the skills, knowledge and experience they have acquired in such jobs. The Court concludes that the low number and

percentage of their utilization in such positions is primarily due to the purely subjective evaluation of aptitude and qualification by the dominantly white supervisory personnel, using individual judgment as to the selection of persons they determine are qualified to become supervisors. *Gilmore v. Kansas City Terminal Railway Company*, 509 F.2d 48 (8 Cir. 1975).

A trainee program has recently been established for both maintenance and supervisory positions. The supervisory force has some 18 members, only one of whom has usually been black, although some blacks have been supervisors in recent years. The work force has been composed of some 34.5% black in skilled operator categories and some 64% black in labor categories. The black supervisor serving regularly and at the time of the trial is supervisor of the "green end", a virtually all black work force, and has virtually no supervision over whites.

Some 29 employees from the bargaining unit have been selected for the trainee program, 10 of whom are black. Two other blacks have qualified as supervisors and work as relief supervisors. They will, according to Olinkraft, be offered the next supervisory vacancies. Although it appears from the evidence that Olinkraft has recently progressed toward full and fair utilization of blacks in maintenance jobs, it is readily apparent that the "affirmative action" program has not met its avowed goals with regard to supervisory personnel.

An examination of the trainee program reveals numerous shortcomings. No written or formalized description of the duties and responsibilities of any of the job categories is made or utilized. This may result in arbitrary work assignments and purely subjective judgment as to work performance. There is no formal or systematized training program to qualify the employees in the bargaining unit for advancement. Again this is susceptible to subjective selection of persons for promotion, even under the seniority weighted system.

The availability of and qualifications required for entry into trainee program va-

cancies is not always properly made known to all persons who may be qualified or qualifiable for such positions. Hiring of maintenance and supervisory people from outside the present work force has been routine, rather than an exceptional situation when employee applicants have been fully considered and none found qualified or qualifiable.

The creation of supervisory trainee positions has been without relation to the actual or potential availability of supervisory vacancies. When an employee enters the trainee program, he is not assured of promotion, but must wait until a vacancy occurs. There is no formal training program, merely assisting and observing a supervisor. Success in the trainee program is measured purely by the subjective judgment of the training supervisor.

Persons who would be expected to qualify and apply for supervisory or supervisory trainee positions are among the highest paid employees in the bargaining unit. Those who might wish to become supervisors are discouraged from applying by the low wage rate paid to supervisory trainees and the long and indefinite wait for a vacancy. It is understandable that many of the trainees have elected to withdraw and return to the bargaining unit before their job seniority expires.

 The Court finds that Olinkraft has discriminated against blacks in selection of persons to be promoted to or hired into maintenance and supervisory positions at the Huttig facility. The Court further finds that Olinkraft has alleviated and overcome such past discrimination as to the maintenance positions, but that its policies and practices as described herein serve to perpetuate the effects of such discrimination as to the supervisory personnel.

In order to remedy the existing effects of such past discrimination, a true "affirmative action" program should be established. An Order will be entered directing Olinkraft to establish written descriptions of the duties of each employment within the bargaining unit, the maintenance personnel and the supervisory personnel at the Huttig

sawmill and plywood mill facilities. All vacancies for maintenance and supervisory positions shall be posted in accordance with the Labor Agreement, and shall include the job description of such position and a description of the desired skills, experience, education, and training for such applicants, all of which shall be job-related. A formal, written "affirmative action" plan shall be developed, disseminated and implemented. (The sample plan set out at 443:551, Fair Employment Practices Manual, BNA, is recommended as a guide.)

Olinkraft will be enjoined from employing persons as supervisors or in maintenance from outside their then employees, unless, after posting such vacancies for bids, there are no applications or bids from employees within the bargaining unit who are qualified or qualifiable within a reasonable time with appropriate training, to perform the duties of such employment. Should outside applicants be sought, Olinkraft shall actively recruit minority applicants, through advertisement, contact with trade schools, the employment services, and other similar methods of recruitment calculated to make known the availability of such positions to both black and white persons who might apply.

The trainee programs for maintenance and supervisory positions shall be modified to eliminate the disincentives to participation, to be related to reasonable expectancies of vacancies, to provide a structured and job-related program calculated to qualify and train participants for such positions, to establish written, job-related standards of measuring the suitability of trainees for promotion, and to provide for the continuation of no lesser a wage scale for trainees than they had received in bargaining unit jobs.

The defendant local Union, while not an active participant in any act of discrimination, has failed to fully represent the interests of its members in promotions to supervisory positions. Although such positions are not a part of the bargaining unit, the Union shall be enjoined to bargain with Olinkraft as to the terms of the affirmative

action program and to accept such modifications as may be necessitated by the Order of the Court as to its current Labor Agreement. With that exception, no relief is found to be warranted as to the defendant Local Union.

The Court finds that the pay differential between the pay rate of blacks in the bargaining unit holding positions and seniority which would appear to qualify them for consideration for promotion to supervisory positions and the pay of such positions is small. The persons who are qualified for such promotions and who have not applied due to disincentives and discouragement would be very difficult to identify. The prospective relief to be afforded by the Order and affirmative action plan will inure to their benefit. Any award of back pay would be both speculative and small in amount. For these reasons, the Court concludes that the prospective relief to be afforded will provide a full and appropriate remedy to the class affected by discrimination, and that a second hearing for the purpose of determining a back pay award is not warranted.

The plaintiffs are not entitled to individual relief, and their individual complaint will be dismissed. Relief for the class will be provided as herein set forth. Counsel for the plaintiffs will be entitled to a reasonable attorney fee. The attorneys for plaintiffs shall submit to the Court a detailed justification for the amount of fee claimed, to which counsel for defendants may except. Such fee, after determination of the amount by the Court, will be taxed as costs to defendant Olinkraft, and not against the defendant local Union.

The affirmative action plan, job descriptions, and other written material to be prepared pursuant to this Order shall be served upon counsel for plaintiffs for review, and this Court shall retain jurisdiction of this cause for the purpose of enforcement of its Order for a reasonable time. Olinkraft will be directed to file a copy of its EEO reports with the Clerk of this Court and to serve a copy upon counsel for plaintiffs during such period as the Court retains jurisdiction, to permit monitoring of the effect of the relief provided.

A separate Order will be entered accordingly.