**Delois MARTIN**

v.

**The ARKANSAS ARTS CENTER.**

**No. LR–C–77–05.**

United States District Court,
E. D. Arkansas, W. D.

Nov. 9, 1979.

John W. Walker, Little Rock, Ark., for plaintiff.

G. Ross Smith and A. Tucker Raney, Little Rock, Ark., for defendant.

MEMORANDUM OPINION

ROY, District Judge.

This action is brought by plaintiff, Delois Martin, a black female, pursuant to the provisions of 28 U.S.C. § 1343(4), 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.* The plaintiff, a former employee of the Arkansas Arts Center, challenges the entire spectrum of employment practices and policies of the defendant on the ground that the policies and practices are racially discriminatory. The plaintiff petitioned for relief not only for her individual claims of discrimination, but for those of all blacks who have sought employment with, who are employed by, or who might seek employment with the defendant. The plaintiff requested that the action be maintained as a class action pursuant to the provisions of Rule 23(b)(2) of the Federal Rules of Civil Procedure. The motion for class certification was denied and the court filed a Memorandum Opinion and Order on June 20, 1979 detailing the reason for denial of the motion.

The court has jurisdiction in this case pursuant to the above cited statutes and on July 2, 3, 5 and 6, 1979 the case proceeded to trial before the court on the individual allegations of the complaint. The trial was adjourned without an announcement of judgment and the court took the matter under advisement pending receipt of briefs. Counsel for both parties have filed excellent proposed findings and briefs in support of their positions,[1] which have proved helpful in determining the issues herein.

The plaintiff, Delois Martin, is a college graduate and holds a B.A. Degree in Business Education. The defendant, Arkansas Arts Center, is a non-profit corporation organized under the statutes of the State of Arkansas whose principle place of business is Little Rock, Arkansas. The Arkansas Arts Center receives funds from various contributors and grantors, both public and private, including funds from the Federal Government through several on-going programs subsidized by CETA, and by the Neighborhood Arts Program, formerly Model Cities. The Arkansas Arts Center operates on a budget of approximately one million dollars annually.

On or about July 1, 1974 the plaintiff applied for the position of full charge bookkeeper which she had been advised by the Arkansas Employment Security Division was available and paying a salary of $7,800.00 annually. After submitting her application for employment, the plaintiff was interviewed by both Mr. Townsend Wolfe, Director, and Mr. Leon Kaplan, Assistant Director.

Delois Martin was hired June 11, 1974. On that date Mr. Wolfe informed the plaintiff that although the stated salary for the position was to have been $7,800, Ms. Jacquelyn Simmons, the retiring full charge bookkeeper whom the plaintiff was hired to replace, had decided to remain in the employ of the Arkansas Arts Center and work two or three days per week until the plaintiff was situated and had become acquainted with people. She was further requested to accept a reduced salary of $6,000 for a sixty-day probationary period since only one salary for the position of full charge bookkeeper had been budgeted and no funds had been provided to pay Ms. Simmons during her extended period of employment. Upon the promise of Director Townsend Wolfe that her salary would be increased to the level originally promised, Ms. Martin accepted the modification in salary.

Ms. Martin was supervised by Ms. Simmons during her probationary period. While Ms. Martin worked with supervision during her probationary period, her job performance appeared satisfactory. While Ms. Simmons was on a two-week vacation in September Ms. Martin was found to have successfully completed her probationary period. Ms. Martin inquired of Mr. Wolfe when she would receive the promised pay increase. When reminded of the initial agreement, Mr. Wolfe authorized Ms. Martin to adjust her salary to reflect her increase to $7,800 per year.

[1]. The last brief was filed October 12, 1979.

The salary of Ms. Simmons, who had thirteen years prior satisfactory experience as full charge bookkeeper with the Arts Center, was also increased to $7,800 per year when she returned from vacation. Ms. Simmons continued to provide on-the-job training and supervision to Ms. Martin. Throughout the period from late September through December, Ms. Simmons noted frequent and repeated errors on the part of Ms. Martin including filing errors which resulted in duplicate payment of invoices, duplicate numbered checks, inability to balance the Arts Center's books without supervision, inability to independently prepare a financial statement and to reconcile the bank statement. Because of his concern that Ms. Martin was not yet capable of assuming the responsibility of full charge bookkeeper, without supervision, Mr. Wolfe requested Ms. Simmons to remain at the Arts Center beyond her originally scheduled retirement date of December 31, 1974. Ms. Simmons agreed to stay on in order to continue her efforts to train Ms. Martin.

In March of 1975 Mr. Wolfe became concerned that Ms. Martin was not progressing in that her bookkeeping errors continued to be frequent and excessive. In order to better appraise the situation, Mr. Wolfe requested Mr. Kaplan to prepare a memorandum detailing the nature and extent of Ms. Martin's bookkeeping errors. Mr. Wolfe received a memorandum from Mr. Kaplan dated March 6, 1975 which Mr. Wolfe reviewed with Ms. Martin. The errors listed in the memorandum ranged from relatively minor to major, including errors on the financial statement as large as $8,000 on two separate occasions, errors in the posting and payment of checks, payroll errors, bank reconciliation errors as large as $9,900, and other miscellaneous errors.

When the frequency of Ms. Martin's errors did not decrease, Mr. Wolfe became more apprehensive concerning Ms. Martin's qualifications to assume total responsibility of the full charge bookkeeper position. Mr. Wolfe offered Ms. Simmons a salary increase to $10,000 per year and the title of Business Manager as an inducement for her to remain at the Arts Center so the work could be kept up-to-date.

The court finds credible Mr. Wolfe's testimony that he was pleased when Ms. Martin applied for the position and that he wanted to make every effort to train and retain her services in the business office. Mr. Wolfe recognized that the Arts Center needed to recruit more blacks for the better positions. The Center had for some period of time, almost since its inception, in return for certain funds, agreed to pursue an affirmative action program. This program had met with very little success, and the Director knew it was essential to the affirmative action program that he retain and recruit more employees from the minorities. Mr. Wolfe testified that in the hope Ms. Martin would eventually be capable of assuming the duties of full charge bookkeeper, he offered her the position of assistant bookkeeper, a position created solely in order to enable Ms. Martin to remain in the employ of the Arts Center. Ms. Martin continued to receive a salary of $7,800 throughout the period of time that she was assistant bookkeeper and assistant bookkeeper with cashier duties.

In January of 1976 Ms. Simmons expressed her intention to retire effective March 31, 1976. On January 30, 1976 Mr. Wolfe informed Ms. Martin that the position of full charge bookkeeper would be vacant and that applications would be accepted for the position. Although Mr. Wolfe expressed grave reservations as to Ms. Martin's ability to perform the duties of full charge bookkeeper, he informed Ms. Martin that she was entitled to apply for the position if she so desired. On March 3, 1976, Mr. Wolfe informed Ms. Martin that despite his reservations, she would be promoted to the position of full charge bookkeeper at her current salary of $7,800 per year during her probationary period with a 10% increase upon successful completion of her probationary period. Ms. Simmons remained at the Arts Center until March 31, 1976 to be available to assist Ms. Martin.

Ms. Martin was required to complete a probationary period as full charge book-

keeper through the date of the final audit by Peat, Marwick and Mitchell because Mr. Wolfe was concerned about Ms. Martin's ability to perform the duties of the job. Ms. Leggett was employed as assistant bookkeeper with cashier duties at a salary of $7,300 per year to assist Ms. Martin. Even with her prior experience, Ms. Martin continued to have problems in assuming her responsibilities as full charge bookkeeper.

The Department of Labor initiated an investigation of the Arts Center's overtime pay practices and after receiving a memorandum from Mr. Kaplan on the subject, Mr. Wolfe asked Ms. Martin to come to his office to discuss the memorandum. He informed her that he had heard she was working until approximately 3:00 a. m. on some occasions on Arts Center books. He told her that such late hours could be injurious to her health and to try to accomplish her duties during regular working hours. Ms. Martin admitted that she was behind in her work.

On March 17, 1976 Ms. Martin filed a charge of racial discrimination against the Arkansas Arts Center with the Equal Employment Opportunity Commission. In order to reply to these charges, on April 16, 1976 Mr. Wolfe requested Ms. Simmons to prepare a memorandum on Ms. Martin's job performance. The following memorandum was submitted to Mr. Wolfe:

Specifically, I feel Delois is unqualified based on the following observations:

1. She frequently is unable to balance the books at the end of the month and usually required my guidance in completing the task.
2. She usually balanced the Financial Statement with the books only with great difficulty and normally with guidance from me.
3. Her understanding of the financial operation of the Arts Center is inconsistent with the level of experience afforded her by the position. Specifically, after two years, she still has no understanding of grants, budget planning; little understanding of the Foundation, membership, and special gifts receivables; and minimal understanding of the day to day receivables. Mrs. Martin was provided with the information but she expressed an unwillingness to learn even the basics of these areas of fiscal support.

4. Most tasks required of Mrs. Martin were done only with great difficulty and with considerable error. The mistakes were so frequent that I felt it was necessary to begin recording the errors in a ledger in the Spring of 1975.
5. Even the simplest tasks that fell within the guidelines of her job description first as a bookkeeper and then as a cashier were difficult for Mrs. Martin to the extent that most staff members began ignoring her and requesting the information of me, adding to my own work load.
6. She was unwilling to accept any responsibilities in the Business Office other than those set forth in the guidelines of her job description. For that reason alone, I could not make recommendation for promotion to my position or Business Office Supervisor, or for that matter, recommend her to another prospective employer.
7. In my judgment, the mistakes that she frequently makes are usually correctable under supervision, but without supervision the mistakes will go undetected and the financial picture will be in error.
8. Mistakes vary from minor to significant, but space and time considerations prevent me from listing them specifically herein. However, reference to the ledger kept on Mrs. Martin for a period of time last Spring should give some indication of the consistent lack of quality of her work. Generally, however, the errors that she most frequently makes include:

(a) filing paid invoices incorrectly
(b) duplication of check numbers making reconciliation of bank account nearly impossible.

(c) Receipting money to the wrong account, throwing Accounts Receivables out of balance

(d) charging payables to the wrong account which necessitates large number of journal entries at end of month.

Finally, she is so slow due to poorly developed bookkeeping skills that she is unable to keep up with the normal day-to-day volume of work as evidenced by chronic lateness of reports and Financial Statements, as well as her inability to meet the tenth of the month payables. "Crisis" tasks like questionnaires, grant reports, and requests for fiscal information from the staff are out of the question in order for her to keep up with her daily routine.

When Ms. Simmons retired on March 31, 1976, the Arkansas Arts Center books were current. Ms. Martin soon fell behind in keeping up with the responsibilities of the full charge bookkeeper position. As the result, Mr. Wolfe was without the financial information necessary for him to make administrative decisions and to report to the Board of Directors.

Mr. Wolfe requested Mr. Kaplan to report on Ms. Martin's progress as full charge bookkeeper. In late April 1976 Mr. Kaplan prepared a detailed statement of Ms. Martin's bookkeeping duties and the errors indicated therein ranged from minor to significant. Among the deficiencies noted were: On March 26, 1976, Ms. Martin wrote payroll checks from the Commercial National Bank account after a transfer of funds had been made to Union National Bank; on April 7, 1976, Ms. Martin made a $50,000 miscalculation on fiscal totals during the 1976 budget meeting.

On April 19 or 20, 1976 Mr. Thom Hall, Registrar for the Arts Center, was contacted by two students who were concerned as to why their January 1976 tuition checks had not been cashed. Mr. Hall referred to his file copies of the daily reports and contacted the Business Office to determine why the tuition checks listed therein had not been deposited. Ms. Martin determined that four reports were missing. None of the checks listed on the four daily reports, a total of $2,872.50, had been deposited. The checks were ultimately located in Ms. Martin's old desk which had been moved to the State Services Office.

Mr. Wolfe inquired of Ms. Martin on May 17, 1976 when the financial report for April would be available, such reports normally having been completed by no later than the fifteenth day of the following month. At this time Ms. Martin replied she could not state when the financial report would be complete. To ascertain if extra personnel were needed, Mr. Wolfe consulted with the accounting firm of Peat, Marwick and Mitchell to determine the number of employees that should be employed to operate the Arkansas Arts Center Business Office efficiently. The report of Peat, Marwick and Mitchell indicated that two employees were adequate to staff the Business Office. Mr. Wolfe testified that due to Ms. Martin's frequent errors and her inability to keep up with the demands of the full charge bookkeeper position, it was necessary to terminate her employment on June 11, 1976. He also gave her a memorandum detailing the reasons for the termination.

The report of the firm of Peat, Marwick and Mitchell on the status of the bookkeeping functions at the Arkansas Arts Center as of June 11, 1976 stated:

1. The general ledgers of both the Arkansas Arts Center (Center) and the Arkansas Arts Center Foundation (Foundation) have not been posted for any transactions which occurred during the months of April and May.

2. The accounting control record (a journal used to summarize cash and accounts payable entries) has not been completed or summarized for April and May.

3. The cash receipts book for April has been summarized. We were unable to locate the cash receipts book pages for May or the first ten days of June; however, there was no indication on the bank deposits for May and June that these deposits had been entered into the cash receipts book.

4. The April and May statements of transactions from Worthen Bank (which are used to record Foundation investment transactions) have not been summarized for posting to the general ledger.

5. Cash disbursements have been summarized and posted to the accounting control record.

6. Journal entries have not been prepared for April and May.

7. Payroll records have been maintained; however, they have not been summarized for posting to the general ledger.

8. Vendor invoices were not being paid on a current basis and accounts payable registers were not current.

According to Mr. Don Smith, the Certified Public Accountant who prepared the report, such entries had always been current in prior years at the time of his annual review of the Arts Center books in preparation for the yearly audit. Mr. Smith was asked during the trial if, in his opinion, Ms. Martin was capable of performing the duties of the full charge bookkeeper and his answer was in the negative. The court attaches particular significance to this testimony because Smith was associated with an independent audit firm, and it appeared to the court that he was giving an unbiased opinion.

Also to be considered by the court is the claim for damages of Theotis Harris, a black instructor in the Model Cities Program. Although not a party to this action, Mr. Harris contends that he is entitled to an award of back pay because the Arts Center had a practice of paying black employees less per hour than similarly situated white employees. His testimony at trial was to this effect, but the court finds no merit in this contention.

Mr. Nathaniel Hill, a black male, had responsibility for approving, at the inception of the program, wages for those individuals employed in the Model Cities Program. Further, Mr. Wolfe sought approval from Mr. Hill to pay wages to the Model Cities instructors equal to those paid regular instructors at the Arts Center. Mr. Hill denied this request. As soon as the Arts Center took full control of the program, and it became the Neighborhood Arts Program, the program instructors were paid at the same rate as regular instructors at the Arts Center. No racial practices or policies of the Arts Center caused the payment of lower wages to Mr. Harris but rather the particular program for which he was working.

The defendant Arkansas Arts Center is an employer within the meaning of Title VII, 42 U.S.C. 2000e–2(A). Title VII of the Civil Rights Act of 1964 states:

It shall be an unlawful employment practice for an employer—

1. To fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privilege of employment, because of such individual's race, color, religion, sex or national origin; or

2. To limit, segregate or classify his employees or applicants for employment in any way which would tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin. 42 U.S.C. 2000e–2

42 U.S.C. § 1981 titled 'Equal Rights Under the Law' provides that:

All persons within the jurisdiction of the United States shall have the same right to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind and to no other.

In a disparate treatment case, the plaintiff has the initial burden of proving a prima facie case of discrimination, according to the guidelines enunciated by the

United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1975). However, in the instant case it is unnecessary for the court to determine whether a prima facie case has been proved by Ms. Martin. See *Buckley v. City of Omaha, et al.*, 605 F.2d 1078 (8th Cir., 1979) wherein the court stated:

> The district court did not err in deciding that appellees should prevail without having first determined whether appellant had established a prima facie case. . . . Appellees articulated legitimate, nondiscriminatory reasons for their actions, and Ms. Buckley did not show these reasons to be pretexts. See *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 802, 804, 93 S.Ct. 1817.

■ Even assuming, without deciding, that plaintiff here made a prima facie case of racial discrimination, the defendant carried its burden of rebutting such a prima facie case by articulating a legitimate, non-discriminatory reason for the employment action taken. *McDonnell Douglas Corp. v. Green, supra.* See also *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The plaintiff, Ms. Martin, did not show these reasons to be pretexts.

The court finds it was impossible for Ms. Martin, despite her earnest endeavors, to fulfill the responsibilities of the position of full charge bookkeeper of the Arkansas Arts Center. The weight of the credible evidence demonstrated that Ms. Martin was not qualified to hold the position and the reasons given for termination were not pretexual. The court does not intend to intimate that Ms. Martin could not perform bookkeeping functions efficiently and well in offices that had different bookkeeping demands. The court believes it was the type of work and multifaceted demands the public made of the Arts Center Business Office that kept Ms. Martin from being able to cope adequately with the job.

For the foregoing reasons the court finds the plaintiff, Delois Martin, is not entitled to damages or injunctive relief against the Arkansas Arts Center and the complaint is dismissed. Judgment will be entered this date in accordance with this memorandum opinion.