Arthur MILLER, A. D. Leonard, William Custer, Allen Neasley, and Mack Griffin, Plaintiffs,

v.

COCA COLA BOTTLING COMPANY OF ARKANSAS and Teamsters Local No. 878, and International Brotherhood of Chauffeurs, Teamsters, Warehousemen and Helpers, Defendants.

No. LR-76-C-109.

United States District Court, E. D. Arkansas, W. D.

Aug. 27, 1980.

Philip E. Kaplan, Little Rock, Ark., for plaintiffs.

Marion J. Starling of Coleman, Gantt, Ramsey & Cox, Pine Bluff, Ark., for Coca Cola Bottling Co.

Melva H. Kozinsky, Little Rock, Ark., for Teamsters Local No. 878.

## MEMORANDUM OPINION

ROY, District Judge.

This litigation began on April 2, 1976, when the plaintiffs filed their complaint against the defendants alleging racial discrimination in employment under 42 U.S.C. § 2000e et seq.,[1] and 42 U.S.C. § 1981.[2] The action was originally filed as a class action. A motion to dismiss the class action allegations was granted on May 29, 1979. The order of the Court entered on that date dismissed the class action allegations of the plaintiffs' complaint and ordered the case to proceed on the individual claims of the five named plaintiffs. On May 1, 1980, International Brotherhood of Chauffeurs, Teamsters, Warehousemen and Helpers was dismissed as a party. The trial of this case came on to be heard on March 4 and May 1, 1980.

The plaintiffs, Arthur Miller, A. D. Leonard, William Custer, Allen Neasley, and Mack Griffin, are all black former employees of the defendant, Coca–Cola Bottling Company of Arkansas. Plaintiffs Miller, Leonard, Custer and Neasley, at the time of their discharge, were transport/forklift drivers and Mack Griffin was the day warehouse foreman.

Defendant Coca–Cola Bottling Company of Arkansas ("Coke") is a soft drink bottling company with its principal plant being located in Little Rock, Arkansas. Coke not only bottles soft drinks, but also sells and distributes its products to various customers. Coke is an employer within the meaning of 42 U.S.C. § 2000e et seq., namely, Title VII of the Civil Rights Act of 1964.

At all times material to this suit, Chauffeurs, Teamsters and Helpers Local Union No. 878 (hereinafter defendant union) was the exclusive bargaining representative of all production and maintenance employees including transport/forklift drivers and merchandisers; but excluding supervisors at defendant Coca–Cola Bottling Company's Little Rock, Arkansas, bottling plant. Defendant union is a union within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. As collective bargaining agent for plaintiffs Miller, Leonard, Custer and Neasley, defendant union owed to them a duty of fair representation. (Plaintiff Mack Griffin's position was not within the purview of the union negotiations.)

## CLAIMS OF PLAINTIFFS MILLER, LEONARD, CUSTER AND NEASLEY

A transport driver's duties consist of loading and unloading a double–axle, semi–tractor trailer rig with Coke products using a forklift and then driving that truck to one of several cities, namely, Morrilton, Batesville, Harrison, Searcy or Brinkley, to one of Coke's branch plants to contract customers. Once there, a transport driver is to unload his truck with a forklift and reload the truck, if necessary, with empty bottles to return to the Little Rock plant. It is very important that these transport trucks make their deliveries on time since the branch

---

**1.** 42 U.S.C. § 2000e–2(a)(1) provides in relevant part:

(a) It shall be an unlawful employment practice for an employer–
  (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin(.)

**2.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

plants or contract customers are waiting for the product to be delivered in order to supply their respective customers.

Plaintiff Arthur Miller began work at Coke in 1964. His job there consisted of loading and unloading trucks and at the time of his discharge he was a transport/forklift driver.

Plaintiff A. D. Leonard, began work at Coke in 1965. His position at the time of his discharge was that of transport/forklift driver.

Plaintiff Allen Neasley began work with Coke in December 1964. He left Coke's employ from 1967 to 1969 in order to go into the service. He was reemployed by Coke in 1969 and worked as a transport/forklift driver until time of his discharge.

Plaintiff William Custer began work with Coke in 1966 working on the loading dock and driving a forklift. In 1969 he was promoted to transport/forklift driver and that was his position with Coke when he was discharged. None of these four plaintiffs seek reinstatement with Coca–Cola Bottling Company of Arkansas.

Prior to October 15, 1973, Coke had both hourly paid employees and employees paid on a variable workweek. The transport/forklift drivers were paid on a variable workweek at a rate of $129.00 per week. This method of pay was changed effective October 15, 1973, pursuant to the collective bargaining negotiations between the union and the company. This is also the effective date of a collective bargaining agreement negotiated between Coca–Cola and the Chauffeurs, Teamsters and Helpers Local Union No. 878. Pursuant to the contract transport/forklift drivers were a Labor Grade 5, which paid in 1973 $2.75 per hour and time and one–half for all hours worked over 40 in a given workweek. (Joint Exhibit No. 1.)

Prior to the effective date of the agreement, a meeting was held at the local union hall for all employees of the bargaining unit of defendant company in order to explain the terms of the contract and for employees to vote whether or not to ratify the contract. At this meeting which lasted approximately two to three hours, business agents of the local union went through the proposed contract section by section explaining the terms of the agreement and answering any questions which might be asked. In addition, Jerry Weeks, a Coca–Cola employee who had served on the negotiating committee, was appointed as acting steward and employees were told either to contact him or go to the union hall, if there were any problems. The plaintiffs were present at this meeting. Plaintiff Arthur Miller questioned a business agent at the meeting about what he considered to be a pay cut. The business agent discussed this with Miller, but he was dissatisfied with the response.

The collective bargaining agreement was ratified by the members of the bargaining unit. Article 6 of the agreement provides for the appointment of a steward to investigate and present grievances. Article 7 of the agreement states that the employer shall not discharge without just cause and further provides that an employee may be discharged for a first instance of refusal to carry out a job assignment. Articles 8 and 9 of the contract provide for a grievance and arbitration procedure. Article 24 and Schedule A of the agreement provide for the establishment of classifications, hours, and wage rates. Finally, Article 34 of the agreement provides that the employer retains the right to establish hours of work and the number of hours and shifts to be worked.

The retention by the employer of the right to establish hours of work is a common and well accepted right of management contained in almost all collective bargaining agreements.

During negotiations for the collective bargaining agreement, defendant union successfully negotiated a change in the wage rate of plaintiffs from a variable workweek at a salary of $129.00 per week to an hourly rate of $2.75 per hour plus time and one–half for all hours worked in excess of 40 hours per week. Defendant

union also negotiated identical changes for certain of the company's white employees. Despite the claim of plaintiffs that a discriminatory wage reduction had been negotiated, there is no evidence to support this allegation.

■ The evidence indicates that the four named plaintiffs averaged over 50 hours a week of working time and that there was no change in the plaintiffs' schedules between the effective date of the contract on October 15, 1973, and the day of their discharge on November 5, 1973. The evidence supports the company's position that they continued to average 50 to 53 hours of work per week after the contract's effective date. The Court notes there were other job classifications changed from the variable workweek to hourly wages and there were white employees within these job classifications that were affected as much as these plaintiffs. Under the forklift classification, Henry Schick, a white male, went from a $116.00 variable workweek to $2.45 an hour under the contract. W. R. Porter, machine operator, went from a $132.00 variable workweek to $2.75 under the contract. Mr. Porter was white. Others were also affected. Therefore, the Court finds that the collective bargaining agreement did not operate in a discriminatory manner against plaintiffs and further that defendants did not negotiate a collective bargaining agreement containing racially discriminatory provisions.

Plaintiffs testified that subsequent to the ratification of the contract they went to the union hall two to five times and asked for a certain business agent whose name they cannot now recall. Plaintiffs testified that they were told each time that the business agent was out of town or in conference. The evidence is contradictory as to whether the plaintiffs stated why they were there or whether they left their names and telephone numbers. There is no evidence to support plaintiffs' allegation that the business agent was available but refused to see plaintiffs because of their race. There is also no evidence from which the Court can conclude that there was disparate treatment afforded plaintiffs over white members of the bargaining unit.

On November 5, 1973, at approximately 7:20 a. m., these four plaintiffs requested a meeting with John Bylander, Operations Manager for Coke in 1973. The plaintiffs met with Mr. Bylander for about five minutes and stated that their wages were not high enough. Mr. Bylander then responded that their wages had been negotiated by Local 878 and that they were not negotiable now. Mr. Bylander then asked them if they would work for those wages or not.

There is conflict in the testimony as to what the four plaintiffs replied at this point in the conversation. Mr. Bylander testified that the four plaintiffs got up without a word, left the room, went toward the back of Coke's plant, punched out on the time clock and left the plant. Three of the plaintiffs testified they informed Mr. Bylander they were going to the union hall and that Mr. Bylander did not respond to their remarks. It was not disputed that the four plaintiffs walked to the time clock, punched out; left their loaded trucks; went to the union hall without prior permission from the company or any of its supervisors; and made no statement about returning to drive the already loaded trucks. The normal hour for the plaintiffs to leave is between 6:30 and 7:30 a. m. Mr. Bylander testified he had to find replacements for these four to drive their transport trucks since they were already late getting out. When the plaintiffs did return to the plant, approximately an hour after they had left, the were informed they were terminated pursuant to the provisions of the collective bargaining agreement.

On November 5, 1973, after being told they were discharged, plaintiff Miller testified that plaintiffs returned to the union hall and informed a business agent whose name he could not recall that they had been fired for walking off the job. The business agent informed the plaintiffs that they had left their job in the wrong way. In Miller's deposition he testified that he got mad and walked out and the others walked out behind him. Plaintiff Neasley testified that

the plaintiffs did not return to the union hall after being discharged.

The collective bargaining agreement (Joint Exhibit No. 1) provides under Article 7, Section 1:

"The Employer shall not discharge, suspend or take other disciplinary action with respect to any employee without just cause. . . . The written warning notice and/or suspension notice shall be given to the employee in writing either by mail or in person and a copy will be sent to the Union; *PROVIDED, no warning notice need be given to an employee before discharge if the cause of the discharge is . . . refusal to carry out job assignment. . . .*" (Emphasis added.)

Also, in Article 35 there is a no–strike, no lock–out provision which states:

"It is agreed that there will be no strikes, walk–outs, slow–downs, or any other similar interruptions of work during the period of this agreement or while any extension thereof remains in effect. . . . Provided, that the Company shall have the right at all times to perform the job assigned to him and participates in any such strike or other interruption of work and replace such employee or employees with other employees of the Company's choice."

These four plaintiffs have failed to show that any white employee has been treated differently than they were for walking off the job without permission. The testimony demonstrates that the four plaintiffs could not name any white employee who had not been discharged for similar action. Jim Robbins, General Manager of Coke, testified that a white transport/forklift driver was discharged on September 14, 1974, when he refused to carry out his assignment and punched out on the time clock just as these four plaintiffs did. Further, the racial make–up of the replacements hired to take the four plaintiffs' places does not indicate racial discrimination in the discharge, namely, two blacks and two whites replaced these four plaintiffs. The history of discharges also does not indicate racial

discrimination. Between 1967 and November 5, 1973, two transport drivers were fired, both of whom were white. After November 5, 1973, and through 1978, three black and three white transport drivers were terminated.

The four plaintiffs contend the transport/forklift job was an all–black job classification within the defendant's work force. The evidence shows that in 1967 when Coke began using transport drivers a white, Edward Cox, worked in that capacity as did another white named James Fitzgerald. There is no evidence indicating this job classification was discriminatorily maintained for blacks only or that it subsequently has been so maintained.

■ The plaintiffs' contention that access to the merchandiser's job classification was discriminatorily denied blacks is not supported by the evidence. None of the plaintiffs testified nor is there evidence that any one of them applied for and was denied a merchandiser's job. The testimony was that Samuel Lea, a black transport driver, was promoted to merchandiser before plaintiff Custer took Mr. Lea's place. In 1973 there were 11 promotions to merchandisers, 3 of those being black and 8 being white. There is a 27.3 percent minority promotion rate to merchandiser. Of the 40 merchandisers in 1973, 11 were black, or 27.5 percent. The SMSA for Little Rock, Arkansas, as of September 30, 1973, indicates the total minority labor force available in the Little Rock SMSA was 15.9 percent and this figure does not take into account qualifications, like a valid chauffeur's driver's license, which would be required for Coke's merchandisers. The statistical evidence does not indicate that the merchandiser job classification was discriminatorily denied blacks.

There are significant differences in the duties performed by merchandisers and transport drivers that support a differential in pay between merchandisers and transport/forklift drivers. The merchandisers' duties, in addition to driving a truck to the customer's place of business, include filling vending machines by hand, displaying the

product at the customer's place of business, unloading the truck by hand, collecting money from or filling out charge tickets for customers, maintaining customer relations, sorting bottles and building displays for the product. These additional duties are a non-discriminatory justification for a higher rate of pay for merchandisers than is paid transport drivers. The fact that merchandisers have helpers to sort bottles and help unload the truck and reload the truck with empty bottles is justified since the record reveals the cases of product are handled by hand and not by a forklift when the merchandiser is on his route. This is physically demanding work and is a nondiscriminatory reason for a merchandiser to have a helper. There is no evidence to support plaintiffs' theory that the merchandiser classification was not open to blacks since 27.5 percent of the merchandisers in 1973 were black. Consequently, no inference may be drawn from the statistics that these four black plaintiffs were discriminatorily denied a higher rate of pay on the basis of race. It is also noted that the wage differences were a result of collective bargaining negotiations between the company and the union.

■ Billy Starks, union business agent, testified that the union processes and submits to arbitration only those grievances which the union determines have merit. Starks also testified that he knew of no cases where the union had processed the grievance of a white employee of defendant company who had walked off the job or refused to carry out a job assignment. There is no evidence to support a finding that the union failed to process a grievance regarding the discharge of the plaintiffs because of their race. There is also no evidence of any conduct from which the Court can infer that the actions of the union were based on race. Rather, the Court finds that on the basis of the evidence and the terms of the collective bargaining agreement that the discharge of the plaintiffs was for a legitimate business reason, and the union acted reasonably and without discriminatory motivation in failing to process nonmeritorious grievances of the plaintiffs.

Although the complaint alleges that defendant union has failed to accept or process grievances which involve allegations of racial discrimination, or which seek to challenge the operation of the collective bargaining agreement as to discriminatory and unlawful action against black employees, there is no evidence to support this allegation. In fact, no grievances alleging racial discrimination have been filed with defendant union by employees of Coca–Cola Bottling Company. Further, the union has taken grievances of black employees of Coca–Cola Bottling Company to arbitration, has settled grievances of black employees to their satisfaction, and has assisted a black employee of Coca–Cola Bottling Company file charges of racial discrimination with the Equal Employment Opportunity Commission.

## CLAIM OF PLAINTIFF MACK GRIFFIN

Plaintiff Griffin was hired in 1950 to load trucks. He became the night loading supervisor in August 1969. He supervised approximately 30 to 40 people in this job. His main duty was to supervise the loading of the merchandisers' route trucks so the trucks would be ready the next day for delivery of the product. In this regard it was imperative to see that the trucks were loaded accurately. The importance of accurate loading derives from the company's method of sales. In March of 1973 Coke instituted a pre–sales system which consisted of sales being made in advance by Coke's sales staff. Load sheets for each route delivery truck were prepared. Then each route truck was loaded with the proper amount, size, and type of produce indicated on the load sheet. This was a change from the old system of the merchandiser performing both functions of making the sales and delivering the product as he went along his route.

Plaintiff Griffin's job performance after the new sales system went into effect was not satisfactory. He was deficient particularly in regard to accurate loading of the trucks. Changes in the system and the

manner in which it affected Mack Griffin's duties were carefully explained to him in a number of meetings conducted by the plant manager, Bob Kaufman. In regard to the loading problems, Coke presented the testimony of Larry Stolzer, John Bylander, Jim Robbins, Larry Johnson, Raymond Powell, Otis Tolbert and Lindy Bowie. All of these witnesses confirmed that while Griffin was the night loading supervisor that misloaded trucks became a very serious problem. Coke's route trucks have allocated times to stop at certain stores and if they miss those times, Coke misses the sales to that customer on that day.

It was not unusual for some route trucks that were supposed to be out by 7:00 a. m. not to be able to get out until 9:00 or 9:30 a. m. because of the misloading by the crew under Mr. Griffin's directions. This required the merchandisers to work longer hours in order to call on all of their customers. The company had to maintain people on the day shift to correct the loading errors made by the night shift.

Otis Tolbert, a black merchandiser in 1973, testified that several times each week his truck was misloaded. Anywhere from 15 to 30 of the route trucks had similar problems. Mr. Griffin was advised by a black checker, Larry Johnson, of mistakes made in loading of the trucks while Mr. Johnson worked under Mr. Griffin on the night shift.. Mr. Johnson testified as follows:

Q. Who was your immediate supervisor?

A. Mack Griffin.

Q. As you checked these trucks did you find any loading errors?

A. Yes, I did.

Q. And, what did Mr. Griffin say when you reported that you had found an error in the loading of a truck?

A. When it was early in the night he would pull the truck aside and seek to get it right. But, the later it got, he told me–get the–excuse me, Your Honor. He told me–I ain't got time to stay here all damn night–get that damn truck out of here.

Mr. Griffin's cost per case on the loading operation was at unacceptable levels as shown in defendant Coke's Exhibit No. 3. This was caused by the number of employees required to load the trucks and the subsequent cost in payroll to the company. The evidence reveals that Mr. Griffin's two immediate successors on the job, Mr. Powell and Mr. Johnson, were able to significantly reduce the cost per case from approximately 4.74¢ per case under Mr. Griffin to 2.64¢ per case under Mr. Johnson. It also reveals they loaded approximately the same number of cases and trucks with fewer people.

There was significant damage to company property on the night shift while Mr. Griffin was the supervisor. The plaintiff had the authority to discipline or fire employees for infractions but, according to his own testimony, he did not do so. There is credible evidence that the plaintiff loaned money to employees on the night shift and would hold their checks until they paid him. Therefore, Griffin had strong incentive not to fire employees for their infractions.

There is also evidence that plaintiff Griffin, through his negligence, damaged a company vehicle in the amount of $900.00 and allowed night crew employees to play dominoes during working hours. At times, Griffin participated in the games himself. Breakage of product on the night shift was an additional problem as was Griffin's refusal to cooperate with his immediate supervisor, Larry Stolzer. He did not follow Stolzer's directions or record the statistics in a log book which was a duty of the supervisors. Mr. Griffin was counseled by Mr. Stolzer and Jim Robbins about these problems, but no improvement was forthcoming.

In December 1973 Griffin was transferred to the job of day warehouse foreman. The transfer rather than a termination was decided upon by Jim Robbins because of Griffin's longevity with the company. His immediate replacement was Ray Powell, white, and then Larry Johnson, black. Currently, James Stacy, black, holds the position of night loading supervisor. This history of replacements does not indicate race was a factor in Mr. Griffin's transfer.

On August 30, 1974, Mr. Griffin was discharged for failure to perform his duties as day warehouse foreman. Larry Johnson, black, now fills that position for the company. Griffin, as day warehouse foreman, continued to refuse to take direction from his supervisor and failed to keep the plant clean with the crew assigned to him for that purpose. Coke was cited by letter from the Food and Drug Administration for having an unclean warehouse. This letter was brought to Mr. Griffin's attention, yet there was no improvement in the overall cleanliness of the warehouse. Coke's franchise contract with Coca–Cola Company can be revoked for having a plant that does not meet the company's cleanliness requirements.

Coke's supervisors are evaluated during the month of July of each year and then given merit raises, effective August 1 of each year, if the company determines that they are entitled to such. Mr. Griffin did not receive a raise on August 1, 1974, and was advised that his job performance was deficient. He was given a series of objectives, including improving the cleanliness of the plant, and he was advised that if those objectives were met, his pay would be increased accordingly. His job performance did not improve and he received none of this incentive pay.

■ On August 30, 1974, Mr. Griffin's supervisor, Larry Stolzer, found Griffin in the break room when he was supposed to be helping load trucks. This incident lead to a recommendation that Griffin be terminated and that recommendation was followed that day by Jim Robbins. The evidence does not support the allegation of the plaintiff that race was a factor in his discharge nor has the plaintiff proved the reasons set forth by the company for his discharge were pretextual.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this action pursuant to both 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.*

---

**3.** Affirmed by the Eighth Circuit Court of Appeals in slip opinion August 18, 1980, 627 F.2d 876.

■ In a disparate treatment case the plaintiffs have the initial burden of proving a prima facie case of discrimination, according to the guidelines enunciated by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Vaughn v. Westinghouse Electric Corporation*, 620 F.2d 655 (8th Cir. 1980). Once the plaintiff has met his initial burden pursuant to the *McDonnell Douglas* test, then the burden shifts to the employer to prove that the reasons for his employment decision are legitimate and not racially motivated. The burden then shifts to the plaintiffs to prove that the reasons given by the employer are pretextual.

It is the Court's conclusion that the plaintiffs have failed to establish a prima facie case of discrimination. The four plaintiffs, Custer, Neasley, Leonard and Miller, have failed to show their discharge was racially motivated and have failed to demonstrate they were qualified to fill the job of merchandiser. Plaintiff Griffin has failed to show his discharge was motivated by race.

Assuming arguendo that the plaintiffs have made a prima facie case of racial discrimination, the defendant employer in this case has carried its burden of rebutting such a prima facie case by articulating legitimate, nondiscriminatory reasons for the employment actions taken against all of the five named plaintiffs. *Buckley v. City of Omaha, et al.*, 605 F.2d 1078 (8th Cir. 1979); *McDonnell Douglas v. Green, supra* ; *Board of Trustees of Keen State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216, 58 L.Ed.2d 216; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957; *Martin v. Arkansas Arts Center*, 480 F.Supp. 156 (E.D.Ark.1979)[3]. The plaintiffs have not shown that the reasons given by the company are pretextual.

The four plaintiffs, Custer, Leonard, Neasley and Miller, walked off their jobs

without permission in derogation of two provisions of the collective bargaining agreement. Consequently, they were fired pursuant to those provisions which have been nondiscriminatorily applied by defendant Coca–Cola as evidenced by its discharge of a white employee for the same violation.

The weight of the credible evidence demonstrates that plaintiff Griffin did not fulfill his responsibilities to defendant Coca–Cola and that the reasons given for his termination were not pretextual.

■ As for the union liability, if any, for employee discrimination, the Court notes that a union acting under the authority of the amended National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, is granted exclusive power within a bargaining unit to bargain collectively with the employer over most terms and conditions of employment. *Steele v. Louisville & N.R.R.*, 323 U.S. 192, 200, 65 S.Ct. 226, 231, 89 L.Ed. 173 (1944); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

■ A breach of the union's duty of fair representation occurs only when the union's conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith. *Russom v. Sears, Roebuck & Co.*, 558 F.2d 439, 442 (8th Cir. 1977), *cert. denied* 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977); *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916–917, 17 L.Ed.2d 842 (1967).

With regard to the negotiation of collective bargaining agreements, unions are afforded a wide range of reasonableness, and the courts recognize that the union must have discretion in bargaining.

"Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid." *Ford Motor Company v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

■ An essential element necessary to limit a union's discretion in bargaining is a bad–faith motive. *Hardcastle v. Western*

*Greyhound Lines*, 303 F.2d 182 (9th Cir. 1962), *cert. denied* 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 (1962); *Hines v. Anchor Motor Freight, supra*.

■ With regard to the administration of the labor agreement as, for example, the union's decision whether or not to process a particular grievance, the union is required to serve the members of a bargaining unit without hostility or discrimination and to avoid arbitrary conduct. *King v. Space Carriers, Inc.*, 608 F.2d 283 (8th Cir. 1979).

Section 703(c)(1) of Title VII lists unlawful employment practices for which labor organizations can be held liable under Title VII. 42 U.S.C. § 2000e–2(c)(1) to (3). In cases involving allegations of racial discrimination under Title VII, the courts have applied the same standard as that enunciated in other unfair representation cases. *Waters v. Olinkraft, Inc.*, 475 F.Supp. 743 (W.D.Ark.1979); *Moore v. City of San Jose*, 615 F.2d 1265 (9th Cir. 1980).

In the instant case regarding the discharge of the plaintiffs, Miller, Leonard, Custer, and Neasley, the claim that the union did not properly represent them in processing a grievance because of their race must be dismissed. Article 7 of the collective bargaining agreement provides that an employee may be discharged for a single instance of refusing to carry out a job assignment. *Kidd v. Automated Business Systems*, 16 FEP Cases 1144 (S.D.Ohio 1974). Further, company and union witnesses testified without contradiction that white employees who have refused a job assignment have been discharged and there is no evidence of disparate treatment. *Waters v. Olinkraft, Inc., supra*, at 749. There is no evidence in the record from which the Court can infer that the union acted with a discriminatory motive in making its decision not to process a grievance regarding the discharge. *Kirby v. Colony Furniture*, 613 F.2d 696 (8th Cir. 1980).

With regard to the negotiation of the collective bargaining agreement, the evidence establishes that the wages of white as well as black employees were changes from

a variable work rate to an hourly rate with time and one–half for all hours worked in excess of 40 in each workweek. In addition, there were legitimate, nondiscriminatory business reasons for the negotiation of a different pay scale for transport/forklift drivers and merchandisers. The Court must, therefore, conclude that the wage rates and classifications negotiated by the parties did not have a disparate impact on black employees.

Defendant union did not act arbitrarily or discriminatorily in either negotiating the collective bargaining agreement or in deciding not to process a grievance regarding the discharge of the four transport/forklift operators.

Accordingly, judgment will be entered on this date dismissing all the claims of plaintiffs Arthur Miller, A. D. Leonard, William Custer, Allen Neasley and Mack Griffin against defendants Coca–Cola Bottling Company of Arkansas and Chauffeurs, Teamsters and Helpers Local Union No. 878.